MACKENZIE *v.* FRANK M. PAULI CO.

1. NUISANCE—ABATEMENT—EQUITY.

Equity courts ought not to prohibit the conduct of a lawful business by a defendant on his own unrestricted premises except as a last resort to restrain an otherwise unavoidable nuisance existing in violation of a complaining party's rights.

2. SAME—INJUNCTION—MODIFICATION OF DECREE.

On appeal from a decree perpetually enjoining defendant from continuing its woodworking mill in the vicinity of plaintiffs' homes, on the ground that the same constituted a private nuisance, there being a showing that the objectionable features constituting a nuisance can largely be avoided by alterations, etc., the decree is modified to imposing correction of, and enjoining, the offensive features in the conduct of defendant's business.

For authorities passing upon the question of duty and liability of one maintaining temporary obstruction in street for purpose of loading and unloading vehicle, see note in 24 L. R. A. (N. S.) 97.

On municipal power over nuisances relating to trade or business in general, see note in 38 L. R. A. 640.

Appeal from Wayne; Gilday, J., presiding. Submitted June 6, 1919. (Docket No. 2.) Decided October 6, 1919.

Bill by David Mackenzie, Janet Mackenzie, E. A. Bridge, J. H. Trybom, Mrs. E. B. Trybom, A. J. Oostdyk, Mrs. Carrie C. Oostdyk, the Bewick Company, Alice E. Craige, trustee, Michael W. Dempsey, William J. Young, and Mary Editha O'Brien, against the Frank M. Pauli Company to abate a nuisance. From a decree for plaintiffs, defendant appeals. Modified, and affirmed.

*Oxtoby & Wilkinson* (*Oscar C. Hull,* of counsel), for plaintiffs.

*Sherman D. Callendar* (*T. A. E. Weadock,* of counsel), for defendant.

STEERE, J. The above named 12 plaintiffs are separate owners and occupants of lots in the eastern part of the city of Detroit, Michigan, either within the territory bounded by VanDyke, Lafayette, Shipherd and Agnes avenues, in said city, or in the immediate vicinity thereof, and have united in this bill of complaint to obtain an injunction for abatement of a private nuisance they charge defendant has developed and is maintaining in said territory, to their annoyance and damage.

The Frank M. Pauli Co., defendant, is a corporation engaged in general contracting, principally confined to carpenter contracts and woodwork, in connection with which it maintains and operates on lots in the above bounded block fronting on Shipherd avenue, about half way between Agnes and Lafayette, a lumber yard and planing mill, or "interior trim factory" as defendant prefers to name the mill portion of the plant. The relief asked in plaintiffs' bill and granted by the trial

court is an injunction perpetually and absolutely re-straining defendant from "maintaining its mill and lumber yard on the land where it is situated and from operating its mill and using the property for the pur-pose of a mill and lumber yard."

There are no restrictions to use or kind of buildings resting upon defendant's land where the activities ob-jected to are carried on. The whole block was origi-nally unrestricted though restrictions are found in a few transfers of recent date. Various portions of the block have been and are yet more or less used for business purposes. Plaintiffs base their claim of right to relief solely upon the proposition that the operation of defendant's mill, or factory, is to them a nuisance as and where operated and located, near their homes and property in a residential section of the city, which they are entitled to have abated as such.

The specific allegations in plaintiffs' bill as to ob-jectionable features in defendant's factory and busi-ness as operated and conducted in that locality are, in brief, disturbing and distracting noises from the machinery, loud shouting of or to the workmen and sounding of a heavy gong at certain hours as notice to employees of resumption and discontinuance of work, sawdust and smoke which at times is emitted from the mill and blown by the wind over that neighbor-hood, extra fire risk from the nature of the business and manner of conducting it, using for private pur-poses and obstructing Shipherd avenue and the alley running north and south through said block at the rear of defendant's property, and the noisy, offensive congregation in and use of said alley by defendant's employees who often gather there and loudly indulge in profane and foul language close at the rear of the homes of certain of the complaining parties, to their annoyance.

Plaintiffs emphasize the fact that the general lo-

cality in which defendant's plant is maintained is not a manufacturing or factory district; that the surrounding section of Detroit, covering an area of about three-fourths of a mile east and west by one-half mile north and south, bounded by East Grand Boulevard on the west, Jefferson avenue on the south, Burns avenue on the east, and Kercheval avenue on the north, is in its prevailing characteristics distinctly a large residential district of the city.

This district is bounded and traversed by some 15 north and south streets, or boulevards, and by five running east and west, named Jefferson, Lafayette, Agnes, St. Paul, and Kercheval avenues. It is now a populous, well built-up portion of the city, fairly shown to be in its general character a residential district east of 'Grand Boulevard and south of Kercheval avenue. There are scattered through it business places on certain of the streets, consisting as a rule of small shops, stores and other lines of business to supply local trade, such as meat markets, groceries, bakeries, drug stores, shoe repair, tailor and bicycle shops, public garages, etc. Kercheval avenue on its north has a double-track car line along it and is concededly a business street, as are certain portions of Jefferson and Lafayette avenues.

The quality and character of neighborhoods and streets varies materially in different portions of that part of Detroit. Burns, Iroquois and Seminole avenues in the so-called "Indian Village" are recognized as amongst the finest and most desirable residential streets in the city, and Seyburn avenue, 70 feet wide, running north and south less than 175 feet west of Shipherd, is described as an attractive, strictly residential street with many fine homes upon it. The lots on its east side extend through to Shipherd, with the residences upon them fronting west on Seyburn. Other parts of the district are of a different quality and less

attractive, having flats, apartment houses and tenements mixed with private residences and occasional business activities. The small block in question surrounded by Agnes, VanDyke, Lafayette and Shipherd avenues, is of the latter character. According to the plat furnished with this record its size is approximately 640 feet north and south by 350 feet east and west, with an alley running centrally through it north and south 20 feet in width from Agnes street south for about 450 feet, where it crosses an east and west 10-foot alley, and, with a jog to the east, continues south 18 feet in width to Lafayette avenue. North of the east and west alley are, as originally platted, 14 lots 60 feet wide, seven fronting east on VanDyke avenue and seven west on Shipherd with their rears on the 20-foot alley. Some of these lots have in times past been subdivided and parts sold, mostly in 30-foot lots. Agnes avenue on the north is 60 feet wide, VanDyke on the east 66 feet, Lafayette on the south 50 feet, while Shipherd on the west is of a disputed width, which the record leaves uncertain, defendant claiming it to be only 22 feet wide and in effect an alley, while plaintiffs claim a width of 30 feet and the blue-print furnished the court, on which it is marked "Shipherd avenue" with no width given, would indicate, in proportion to the other streets, nearer 40 feet. It is paved with concrete, has a cement sidewalk along it and residences fronting upon it, there being several between Agnes and Lafayette avenue.

Plaintiffs Oostdyk, Mackenzie, Bridge, Dempsey, Trybom, and O'Brien, own lots in the east half of this block fronting on VanDyke and extending back to the alley, those of the three last mentioned being directly across the alley from defendant's factory which extends about 90 feet along it. Plaintiffs Craige and Mackenzie own land on the east side of VanDyke avenue, the Beckwith Company owns land on the east

side of Shipherd avenue extending from Lafayette avenue north to within about 60 feet of defendant's property, while plaintiff Young owns land on the west side of Shipherd. Two belated participants named Nehls and the Parker Estate Co., not named as plaintiffs in the bill but who subscribed to it, own land on the east side of VanDyke avenue. Except that of Young and the Parker estate the holdings of all plaintiffs have residences upon them.

Frank M. Pauli, who testified to being engaged in the building business in Detroit for 35 years, was in the employ of others during the earlier period of his activities and just when he became a building contractor for himself is not disclosed, but in 1909 he purchased a 30-foot lot in this block fronting on Shipherd avenue, extending east a depth of 168 feet to the alley, from two contracting carpenters named Brown and Farr who had some time before erected upon the alley a comparatively small one-story wooden building, 50x30 feet, used by them in their contracting business as a carpenter shop, or interior trim factory, which was equipped with a shaper, band-saw and rip-saw. For some time Pauli used this building and equipment as it was when purchased, employing in it "about six" men. The following year he bought a 30-foot half lot just north of his first purchase, which had upon it a cottage fronting Shipherd avenue with a barn at the rear upon the alley, and began to expand his business in that locality.

The so-called Frank M. Pauli Co. had been in existence about eight years and was incorporated about five years prior to the hearing of this case, in May, 1918. Its stockholders were principally members of the elder Frank Pauli's family, his son Frank G., who had previously worked for his father, becoming a member of the organization and active in its management. As its contracting business expanded defendant

gradually increased its real estate holdings and enlarged its plant until at the time this suit was begun it had acquired five adjacent 30-foot lots and constructed additional buildings upon them both brick and wood, the whole constituting a mill or factory equipped with various kinds of woodworking machinery, operated by electric motors of different sizes, in which it employed over 30 men, and was then employing in its contracting activities in the city a force of about 150. The brick factory building in which is located most of its machinery is 30x97 feet, two stories high, located on the rear of the lots directly across the alley from the rear of lots owned and occupied for residential purposes by plaintiffs Bridge, O'Brien, Dempsey and Trybom. North of its factory building is a lumber shed, 45x168 feet, with a storage capacity of 27 carloads. It uses five motor vehicles, the largest being a 3-ton truck 21½ feet long with a 12-foot body, and has five lumber wagons for handling material. Its increased capacity was not only sufficient to keep up with requirements of its building contracts but to do factory wood work for others, including a contract to make "Liberty Cases" for the government, and defendant was planning to further enlarge when this suit was begun.

When Pauli, Sr., made his first purchase that portion of the city was sparsely settled and scantily improved in comparison with its present condition. He for some time employed but few men and used but little machinery, the business being conducted with comparatively little noise, dust or confusion, but after the company was incorporated, men, material and machinery were increased with a marked increase of dust, smoke, noise and obstruction of the street and alley until objections and complaints began to be made by those living in the vicinity which were apparently resented and treated with scant consideration until a

somewhat belligerent status developed between certain
of plaintiffs and Pauli, Jr., and the employees under
him.   Plaintiff Bridge testified that the men were a
"noisy bunch" and the sound of the mill became such
that when unwell he could not remain in his own home
and on several occasions had to go over to his sister's
home and stay there to escape it; that when he com-
plained to Pauli, Jr., about it the latter seemed to take
delight in telling him "that they were going to put in
new machinery and other things."   Certain of the
women living nearby who complained of the dust,
noise and conduct of the workmen when congregated
in the alley back of their homes, indulging in profane
and indecent language, were answered at times as
they claimed with abuse and insult, which some of the
more militant sought to suppress by turning a camera
and the hose on Pauli, Jr., and some of his men, giving
rise to admittedly unparliamentary reflections by the
latter.

Amongst its varied equipment of mechanical appli-
ances for shaping wood defendant has about 20 saws
for different purposes—such as a jig-saw, rip-saw,
swing-saw, cut-off saw, etc.   A swing-saw put in oper-
ation in 1915 and a gong installed to signal employees
are particularly dwelt upon by plaintiffs as producing
penetrating sounds which they found intolerable.   The
loud ring of this particular saw is emphasized by vari-
ous witnesses as the culminating annoyance from de-
fendant's factory, being described by them as "fierce,"
such that "no one can stand it," resembling "the last
squeal of a dying pig" or the note of "these peanut-
stand whistles which the city stopped" magnified
"about a thousand times," a "high-pitched, screeching
whistling" sound which "goes through the house
whether the windows are closed or not and you cannot
get away from it."   It was shown that defendant's
factory work starts at 7 o'clock a. m. when the gong

is sounded; that the employees commence to gather before that time, often as early as 6:30, and usually in the alley when weather permits, where they indulge in loud and offensive language to the disturbance of those living nearby; and again at the noon hour to eat their lunches there, the refuse of which they throw around in the alley and sometimes into some of plaintiffs' nearby back yards; that defendant has monopolized said alley to a large degree for use in connection with its factory, piling refuse, lumber and other material there, leaving its wagons in the alley overnight and occupying it for other purposes of its business; that the men working there in the open frequently throw down boards and other articles from above, shout orders and curse, to the annoyance and often exclusion of plaintiffs and the public generally from said alley, which defendant uses as though it were its private property. It was shown that defendant also now produces in its factory a large amount of wood refuse and sawdust which it at times dumps from the second story of its factory into wagons in the alley; that when the sawdust pit is full the dust is allowed to run out into the alley and be carried by the wind about the neighborhood and into plaintiffs' houses and yards.

Without further details it may be said that the evidence well supports the conclusion of the trial court that in the conduct of its business defendant has in several of the particulars complained of been guilty of maintaining a private nuisance against the rights of plaintiffs which it is within the jurisdiction of a court of equity to enjoin at their instance.

The trend of the story as a whole indicates that under Pauli, Jr.'s, management the business has been enlarged and conducted largely on the theory that the owner has a right to do as he pleases with his own, forgetful of the fact that defendant was not the ex-

clusive owner of the street in front or alley at the rear of its property, and in disregard of the principle underlying the law of nuisances, concisely embodied in the old legal maxim *sic utere*, etc., which enjoins upon each the duty to so make use of its own as not to injure another.

That defendant's business as conducted at the time this suit was begun and tried had developed into a private nuisance in certain of the particulars complained of, which should be and properly was enjoined by the trial court, we are well satisfied; the more serious question for consideration is just how far the injunction should go, for the restraining decree issued by the trial court, from which defendant appeals, completely and perpetually closes down its factory and destroys its established business in that locality.

Application was made to the trial court for a rehearing and modification of the decree, limiting it to enjoining the claimed objectionable features complained of without absolutely prohibiting the business to be continued. Insisting that the matters complained of were greatly exaggerated, defendant claimed and proposed to further show that by abandoning certain usages, changes in machinery and resort to more careful management and modern methods, the business can be continued without being a legal nuisance. As the case now stands there is a measure of showing that the objectionable features constituting a nuisance can largely be avoided by alterations, discontinuance of certain objectionable things, and improved appliances. Pauli, Sr., is not shown to have actively participated in the hostilities which developed and was apparently a fair and candid witness as to the situation when on the stand. In the application for a rehearing he offers with suggestion of method to do whatever the court may direct to eliminate the par-

ticular things complained of and held by the court a legal nuisance, which the trial court when deciding the case found consisted principally of "smoke from the smoke-stack of the factory, dust and sawdust from the planing mill, noise from the machinery and the manner in which defendant conducts its business, namely, doing a large portion of their work upon the public alley and street on either side of their factory." While the latter usage has at times amounted to a nuisance proper to enjoin, it does not follow from it that the continuance of a legitimate business on defendant's private premises should be suppressed also because of the nuisance in the highway; though if such practice was essential to the business it is conceivable such might be the indirect result. The pertinent law upon that subject is plainly stated in 1 Wood on Nuisances (3d Ed.), p. 314, as follows:

"Neither has a merchant or trader or manufacturer, or any person, no matter how great the necessity of his business, any right to use any part of the highway for the deposit, exhibition or sale of his goods. Neither has he a right to conduct his business in such a way as to keep goods constantly standing on the walk, or teams constantly or for any considerable portion of the time employed in front of his premises engaged in loading or unloading goods, and the fact that the same is necessary in the course of his business is no excuse; it is his duty to carry on his trade where he will produce no serious annoyance to the people, as public convenience and necessity are paramount to the ends of trade or individual necessity."

Upon the question of whether the injunction goes too far in the first instance, we start with the universally recognized rule that equity courts ought not to prohibit the conduct of a lawful business by a defendant on his own unrestricted premises except as a last resort to restrain an otherwise unavoidable nuisance existing in violation of a complaining party's rights.

"Where a business can be so carried on that it will not constitute a nuisance an injunction restraining the carrying on of such business will not be issued, but the court will so frame its order that the business may be continued provided it is so conducted as not to create a nuisance." Joyce on Nuisances, § 90.

The duty of the court in that particular is thus well summarized from abundant authority in 14 Enc. of Pl. & Pr. p. 1148:

"A court of equity is always reluctant to grant a perpetual injunction against the carrying on of a legitimate business. Where the court finds that such an establishment as conducted, is a nuisance, it should allow the defendants to show, if they can, that, by the use of proper methods and appliances, it is possible to continue the business in the same place without its being a nuisance. Where this can be done, a decree absolutely enjoining the defendants from further conducting such business is too broad; the injunction should be limited to such uses as create the nuisance, leaving the right to carry on the business in a proper manner."

In *Chamberlain* v. *Douglas*, 24 App. Div. 582 (48 N. Y. Supp. 710), involving an injunction restraining the operation of machinery in a planing mill by steam power. the court said:

"Injunctions restraining the carrying on of a legitimate and lawful business should go no further than is absolutely necessary to protect the rights of the parties seeking such injunction. When a person is engaged in carrying on such business he should not be absolutely prohibited from doing so, unless it appears that the carrying on of such business will necessarily produce the injury complained of. If it can be conducted in such a way as not to constitute a nuisance, then it should be permitted to be continued in that manner."

In *Green* v. *Lake*, 54 Miss. 540, where the nuisance complained of was the noise and refuse from a mill,

interdiction of which by the trial court was modified to restraining certain offensive features, it was said:

"A perpetual injunction against the lawful use of property in a city ought not to be decreed if the owner can apply to his steam power and machinery such alterations and appliances as will relieve them from the special and unusual annoyances complained of in the case. * * * If the grievances can be removed by the aid of science and skill, a court of equity will go no further than to require those things to be done. The legislature and the local municipal authorities have ample power to regulate the business of the city so as to produce as little inconvenience and annoyance to the different classes of its population as possible. Noisome and offensive trades may be assigned to certain limits."

To like effect see, also, *Collins* v. *Wayne Iron Works*, 227 Pa. 326 (76 Atl. 24) ; *McCarty* v. *Carbonic Gas Co.*, 189 N. Y. 40 (81 N. E. 549, 13 L. R. A. [N. S.] 465, 12 Ann. Cas. 840) ; *Miller* v. *Webster City*, 94 Iowa, 162 (62 N. W. 648) ; *Windfall Manfg. Co.* v. *Patterson*, 148 Ind. 414 (47 N. E. 2, 37 L. R. A. 381) ; *McMenomy* v. *Baud*, 87 Cal. 134 (26 Pac. 795) ; *Lorenzi* v. *Market Co.*, 19 Idaho, 674 (115 Pac. 490) ; *Weaver* v. *Kuchler*, 17 Okla. 189 (87 Pac. 600). This court has consistently recognized such to be the general rule. *Gilbert* v. *Showerman*, 23 Mich. 448; *Edwards* v. *Mining Co.*, 38 Mich. 49; *Shepard* v. *People*, 40 Mich. 487; *Ballentine* v. *Webb*, 84 Mich. 38 (13 L. R. A. 321) ; *Northwood* v. *Asphalt-Paving Co.*, 126 Mich. 284 (54 L. R. A. 454) ; *Washington Lodge* v. *Frelinghuysen*, 138 Mich. 350.

In *Ballentine* v. *Webb, supra,* where this court modified a decree perpetually enjoining the maintenance of a slaughter house devoted principally to butchering hogs received in carload lots to the number of about 300 a week, it was held that defendant's business when properly conducted was not of such a character as to

constitute a nuisance in the neighborhood where sit-
uated and complainants were not entitled to an in-
junction because its existence there depreciated the
value of their property, and directed that the decree
should be modified to elimination of specific objection-
able features in conduct of the business, found by the
court to constitute nuisances, saying in part:

"Defendant's business, established under the cir-
cumstances of this case and conducted by him on his
own premises, will not be enjoined, because it cannot
be carried on without some degree of offense and an-
noyance to those living near it. It is only when it
reaches the point of discomfort where it becomes in-
jurious to health that the injury can be said to be
irreparable so as to call forth the extraordinary power
of a court of chancery to destroy it."

It is not claimed that defendant's wood-working in-
dustry is a nuisance *per se*. Inherently, it is not when
properly conducted unhealthy, filthy or unwholesome,
nor disagreeable and offensive to persons generally.
The bare fact it may not be acceptable as a near neigh-
bor to plaintiffs and may produce some discomfort or
inconvenience to those nearby will not in itself justify
its total elimination by injunction. The court has no
concern with the indicated effort of plaintiffs to ban-
ish business from this block. Most of them invested
in this unrestricted subdivision some time after de-
fendant's and other business enterprises of more or
less magnitude were established there, purchasing ad-
vantageously and at an opportune time. Those near-
est defendant's plant conceded their holdings have
much advanced in value since they purchased. None
of them expressed a desire to sell at the admittedly
handsome profit obtainable or were willing to name a
price they would accept. This unrestricted property
had been purchased to a marked extent by those who
did and do use their lots for residence and business
purposes in combination, the business generally being

at the rear of lots, with residences on the front. The block is not and never has been a high-class exclusively residential district. Tenements, flats and apartment houses predominate. All plaintiffs owning property in the block, except Miss O'Brien, have at times rented a part or all of it to tenants, as a business matter. Miss O'Brien bought her lot in 1913, directly across the alley from defendant's plant and adjacent to a property which had cottages in front and a long established wholesale bakery upon the alley at its rear. This bakery ran four ovens, had at times baked as high as 12,000 loaves of bread per day, employed at the time of the trial 14 persons in the bakery proper, had seven salesmen and 32 automobiles which were preceded by the use of from 18 to 25 horses. Across the alley from the bakery and north of defendant's property Mr. Dyar, a riding master by vocation, owns, as he described it, "90 feet frontage and 165 feet depth." His residence, 56 Shipherd, and two tenement houses being on the front, with a riding academy located at its rear on the alley. He testified that during the nine years he had conducted the business he kept from 10 to 58 horses stabled on the premises with the feed for them there; that he was then reducing his riding school business and having constructed on the property a public garage 90x70 feet which would be used for strictly business purposes. At 46 Shipherd, between Dyar's and Pauli's places of business, is the home of a philosophic colored citizen named Buster who appeared as a cheerful witness for defendant. He testified that he owned his home, had resided there with his family for about five years in peace with his immediate neighbors, defendant's operations had not injured his health or bothered him, nor had there been any trouble between him and the lumber shed next to his place; that he was content with existing conditions, having in mind that if a private residence was

substituted as his immediate neighbor there was a possibility, as he stated, "I might be undesirable to them and they might be undesirable to me."

Defendant's machinery is exclusively operated by electrical power, each machine by an independent motor. No fuel is consumed for power purposes. The smoke problem in connection with its heating plant would be no different than that of any business building or apartment of equal size. That and the matter of fire risk are proper subjects in the first instance for municipal control. A smoke consumer has been installed by defendant under direction of the city authorities and an extension of its chimney or change of fuel may, and defendant claims will, obviate the charged smoke nuisance. The offensive conduct of employees and use of the highways amounting to nuisances can and must be eliminated.

The sounding of a gong or whistle on defendant's premises to indicate the starting or stopping of work or for other purposes as was the custom can and must be discontinued, as must also the noisy use of the swing-saw or other appliances more recently installed in the enlargement of defendant's plant which occasioned the shrill, penetrating and disturbing sounds complained of. The escape of sawdust and other light refuse from defendant's mill to be carried by the wind around the neighborhood and upon plaintiffs' premises must be prevented and, in fine, the offensive things in the conduct of the business specifically pointed out and found by the trial court to constitute legal nuisances will be enjoined.

It is claimed for defendant that by change of construction, methods and appliances which it proposes these objectionable features can be eliminated. Defendant's business as originally and for some years conducted occasioned little if any complaint and cannot be held to have been a legal nuisance. Plaintiff

Trybom, a recent advent who moved into the block in 1914 and first complained of the noise to Pauli, Jr., in 1915, told him, "You were not a nuisance when we came, but you are going to be a great nuisance with your heavier machinery." Plaintiffs' counsel says, "It is difficult to say just when defendant's mill became a nuisance." That during its expansion certain features and usages in its operation became such is clearly evident. Its cramped locality, character and the history of its management are such that threatened further enlargement there, either in buildings, machinery or force, must be restrained.

We conclude that upon the record the decree in the first instance should be modified to imposing correction of and enjoining those offensive features in the conduct of defendant's business particularly complained of and found to be nuisances, in harmony with the course adopted in *Ballentine* v. *Webb*, and *Northwood* v. *Asphalt-Paving Co.*, *supra*.

The modified decree prepared for settlement may in form and general outline follow defendant's proposed substitute in the printed record. So modified the decree of injunction will stand affirmed with costs to defendant in this court.

BIRD, C. J., and MOORE, BROOKE, FELLOWS, and STONE, JJ., concurred. KUHN, J., did not sit:

The late Justice OSTRANDER took no part in this decision.