SHIMBERG *v.* RISDON CREAMERY CO.

1. NUISANCES—HORSE STABLE—INJUNCTION—BURDEN OF PROOF.
   In a suit by the owners of apartment houses and others to restrain a creamery company from operating and maintaining a building, in connection with its business, for the stabling of horses or other animals, on the ground that it constitutes a nuisance, where it appears that when plaintiffs acquired their property they knew that a barn where one or more horses were kept was on defendant's lot, that they knew there were no building restrictions, and that they also knew that defendants had an established business which it might be presumed would grow, *held,* to justify the court below in refusing the injunctive relief asked for, plaintiffs not having sustained the burden of proof.

2. APPEAL AND ERROR—FAILURE TO APPEAL PRECLUDES RELIEF.
   Where defendant, in a suit to restrain a nuisance, did not appeal, it could not complain of the modifying injunction granted by the court below that the changes therein required are unnecessary, but must abide by the decree.

Appeal from Wayne; Jayne (Ira W.), J.    Submitted June 17, 1921.    (Docket No. 118.)    Decided July 19, 1921.

Bill by Pearl P. Shimberg and others against the Risdon Creamery Company and others to enjoin an alleged nuisance.    From the decree rendered, plaintiffs appeal.    Affirmed.

*Samuel Shimans,* for plaintiffs.

*Donnelly, Hally, Lyster & Munro,* for defendants.

MOORE, J.    An inspection of the attached plat and a reading of the opinion of the trial judge will give an

On use of property for stable as nuisance, see notes in 17 L. R. A. (N. S.) 1025; 49 L. R. A. (N. S.) 958.

intelligent understanding of what this litigation is about.

The opinion reads:

"In this cause plaintiffs Pearl P. Shimberg, Lillian R. Shimberg, Thomas M. Worden, and Leonard Klemm, by bill of complaint setting forth various grievances which will be hereinafter more specifically set forth and referred to bring this suit to restrain perpetually the Risdon Creamery (a corporation), Charles J. Risdon and Robert McDonald and William Young from operating and maintaining a building located on lots 8 and 9 of Herbert L. Baker's subdivision of part of lot No. 2 of the James Messemore's estate, being known

as No. 390-392 Linwood avenue, city of Detroit, as and for a stable for the accommodation of horses or other animals, and from installing in any of the said buildings now built thereon, or which may be built thereon hereafter, horses or other animals, and from using the afore described property for the purpose of maintaining thereon stables or other buildings for the accommodation of horses or other animals. The pertinent facts in support and contravention of the general allegations in the bill of complaint and answer to be adduced from the testimony offered by the respective parties and gained from a personal inspection of the neighborhood and premises by the court, are as follows:

"(1) Plaintiffs Shimberg have been for two years the owners of a fourteen-family apartment building covering a large part of the part which they own of lot 1, of the above described plat and indicated on Exhibit 1 of the evidence in this case. Plaintiff Worden did not appear, nor did any one appear in his behalf. Plaintiff Klemm is the owner of lot 3, of the above described plat and exhibited on Exhibit 1.

"(2) The Grand Boulevard upon which plaintiffs' property faces, is a broad thoroughfare which circles the city from the Detroit river on the east to the Detroit river on the west. It is now practically built up of a most heterogeneous array of buildings ranging from costly and handsome residences in parts to parks, schools, hospitals, workmen's cottages, factories, garages, stores and outhouses and sheds in other parts. Traffic on it is restricted to light vehicles of which there is an endless procession passing both ways continuously during waking hours. In and of itself it offers no standard of use for the property bordering upon it.

"The north side and the particular part along which lies plaintiffs' property, is devoted to high grade residences. The south side of this particular block is given over to commercialized residential structures. (The buildings of both plaintiffs are rented in whole or in part and were constructed for that purpose.) In adjoining blocks and facing the boulevard are oil stations and sign boards.

"(3) The block bounded by West Grand Boulevard

on the north, Stanton avenue on the east, Ferry Park on the south, and Linwood avenue on the west, in the center of which stands this barn, the alleged nuisance, is devoted to a number of purposes which demand recitation.   The character of the north side has been set forth.   On Linwood avenue on which fronts defendants' property, the business places of the neighborhood have located as they were needed.   This devotion to business has recently been rapidly augmented by the laying of a double-track street car line which swings around also on Ferry Park avenue on the south, and 'following the traditional development of the city, would seem the logical location for the development of the retail merchandise service necessary to the residential development of the section,' in the words of this court's finding in Sherman *et al. v.* Shervitz *et al.*, quoted in plaintiffs' brief.   Ferry Park avenue on the south is as yet largely devoted to inexpensive residences but is unprotected by building restrictions, and already, with the advent of the street car line, has felt the encroachment of business.   Stanton avenue on the east is devoted to expensive residences.

"(4) The neighborhood is residential in character but without evidence of 'restrictions' or 'exclusiveness' with Linwood avenue devoted to the retail business of the community, and the boulevard with its cosmopolitan character and its characteristic traffic.   Prospective residents must be bound to have observed the obvious features of these streets.   Within a few blocks in various directions there are other stables housing horses used for commercial purposes.

"(5) The Risdon Creamery Company and Charles J. Risdon who assume full responsibility for the defense of this action, are the owners of lots 8 and 9 heretofore described and referred to in Exhibit 1.   These lots are located approximately across the street from the building of the defendant in which he has conducted his creamery business for 14 years.   Lot 8 has been owned by the defendant for a number of years, and previous to the erection of the stable complained of, held a barn in which was housed from one to three horses and a shed in which a large number of chickens

were killed on one or two days of each week by a grocer of the neighborhood. Lot 9 was recently purchased by the defendant to enable him to alter the plan of his stable in the effort to meet plaintiffs' objections to his original plan.

"(6) This block above described is traversed by two 20 foot and one 16 foot alley, as indicated on Exhibit 1, so that the stable complained of is immediately bounded on the north by a 20 foot alley which separates it from the plaintiffs' properties; is immediately bounded on the east by a 20 foot alley; is immediately bounded on the south by a 16 foot alley, and on the west lies adjacent to defendant's own property which extends approximately 100 feet to the street. These alleys are unpaved. For a location in a well built up residential section, the stable building is peculiarly isolated by these public alleys.

"(7) The stable in question was erected by the defendant across the rear of said lots 8 and 9 during the past year. It is a two-story brick veneer structure, approximately 40 feet wide and 70 feet long. Joining it on the west side is a shed, open on the south and north sides, for housing milk wagons. The floor of this shed is paved with concrete. In the stable proper the stalls are on the first floor, with oat bins and hay loft above. The floor is concrete, and stalls paved with creosote block. There is ample drainage and sewer connection. There are several ventilator shafts from the first floor through the roof. On the south side a small room has been built up approximately airtight, in which the manure is kept. The cost of construction was about $11,000. On the whole it may be said to have been well and substantially made, with some minor exceptions, which will hereinafter be more particularly referred to.

"(8) The building is constructed for a possible 50 horses. It now houses about 36 which are used by the defendant in his business of the retail delivery of milk and cream, the business which he has gradually developed with the general development of the northwestern section of the city. From April to October 1st of each year these deliveries start at 12:30 a. m. and during the other months at 5:30 a. m. at which

times the horses are hitched to the wagons and driven across the street.

"(9) The apartment building owned by plaintiffs Shimberg, stands on lot 1 which lies across the alley and opposite to part of the stable and a part of the wagon shed heretofore described.    The apartment house is a three-story structure of apparently substantial, not to say elaborate, construction.  It occupied all but about 18 feet of the rear of the lot.    The windows in the sitting rooms and bed rooms of the 6 rear apartments open in the direction of the alley and stable.    The distance between these windows and the stable openings is, therefore approximately 40 feet. Property of plaintiff Klemm is a two-family apartment situated on the front end of lot 3, the distance from the rear of said apartment to the said stable being approximately 100 feet.    There is a double garage built across the rear of this lot 3, the property of the said Klemm.    Plaintiff Worden appears to be the owner of lot 4 lying further to the east, but he is not appearing nor any one appearing in his behalf, a more particular description of his property is not attempted.

"Judging from the appearance and testimony of such of the plaintiffs and their tenants as appeared on behalf of the plaintiffs, there appears warrant for the language of the plaintiffs' bill of complaint, that they are people of 'more than average refinement and taste, engaged in high tension, mercantile, financial and professional pursuits, requiring for the maintenance of their health and efficiency quiet, undisturbed and peaceful rest, and odorless and suburban air,' which characteristics will be hereinafter more particularly referred to.

"(10) In determining whether various features of the operation of this stable are of a nature as to render living in a neighborhood so uncomfortable to plaintiffs as to constitute these features legal nuisances, this court is confronted with the interminable conflict of testimony so characteristic of these controversies. In the instant case this conflict ranges neighbor against neighbor, landlord against tenant, and in two instances, extraordinarily, husband against wife.  Counsel for plaintiff and defendant have spent a great

deal of time commenting upon this testimony, witness by witness. A re-analysis of it in this opinion would avail nothing. We shall content ourselves after a careful recollection of the witnesses and their respective numbers, their appearance on the stand, their interest or lack of interest in the subject-matter and their standard of determining discomfort; a painstaking perusal of the respective briefs, and an extended inspection of the apartments, with the following conclusions:

"That setting up that ancient common-law standard, in the words of Sir Knight Bruce: 'Not merely according to elegant and dainty modes and habits of living, but according to plain, sober and simple notions among the English people,' which must be used in differentiating those, 'trifling and undesirable nuisances which disturb the nerves of a fastidious or over refined person,' from those positive nuisances which compels uncomfortable living, the plaintiffs have not sustained that burden of proof which would warrant a court in permanently enjoining the defendant from continuing this enterprise complained of.

"There is no convincing evidence of an increase in the number of rats. In fact, reason supports the testimony of the defendants that this modern brick and concrete structure would be less inviting to rats than the old frame barn and shed. There is no testimony of the presence of horse flies and no proper basis of comparison to judge of an increase in house flies, and on the day of the court's inspection in the latter part of November, there were overflowing and uncovered garbage receptacles in the rear of the apartments of both testifying plaintiffs. There is no testimony of annoying stamping or pawing of horses while in their stalls.

"There is left for consideration the question of noxious odors and noises occasioned by hitching the horses to the wagons during the night. Accepting the testimony of plaintiffs that when the wind is blowing from the southwest that these odors are sufficiently strong as to render their living uncomfortable during the hot months of the summer, and that occasional noises attendant to hitching up the horses are so loud as to be disturbing, we believe that both of these

nuisances may be remedied without resorting to the drastic means of discontinuing the business altogether, to which remedies we shall more particularly hereafter refer.

"(11) While plaintiffs have offered some proofs of complaint on the part of tenants, it does not appear that any of their tenants have actually moved, but rather it does appear that they have remained in spite of a general material increase in their rents, both in the apartments of the plaintiffs Shimberg and in the neighborhood generally, since the opening of the stable. Plaintiffs Shimberg have for the first time taken residence in their apartment building since the inception of this controversy. It should be noted that there has been a general scarcity of living accommodations throughout the city during these months and a general rise in realty values. Plaintiffs' properties have shared in this increase. Their effort to carry us into the realm of speculation on probable increases without the presence of the stable is not convincing, and moreover, it seems to be based on the general unpretentious appearance of the building to prospective purchasers who look upon the stable as an undesirable neighbor, which of itself is not sufficient evidence of nuisance.

"(12) As to the history of the controversy, when it became known that defendants planned the erection of this stable on lot 8 of the plat heretofore described, plaintiffs Shimberg protested by letter, intimating that they would interview the residents of the neighborhood generally and apply for a restraining injunction if the defendants continued with their plan. Whereupon defendants purchased lot 9 adjoining, altered their plans and proceeded to the construction of the stable as it now stands. In August plaintiffs applied for this injunction, and on the intimation of the then presiding judge that opportunity would first be given to defendants to show cause, counsel mutually agreed to an early hearing on the merits, which is now before this court.

"The law which must govern the determination of this issue we construe to be as follows: The stable is not a nuisance *per se*. It may, however, be so operated as to be a nuisance, from which neighbors

will be entitled to injunctive relief.   Each situation must be construed in and of itself, the standard of judicial determination being: 'The plain and sober and simple notions among English people,' by which standard it must appear not that the situation complained of is such 'as disturbs the nerves of a fastidious or over-refined person   *   *   *   undesirable neighbors who affect the value of property or drive away tenants not being nuisances.'   *Ross* v. *Butler*, 19 N. J. Eq. 294, but that the situation renders living nearby either uncomfortable or unhealthful.

"Courts will view the continuation or extension of· a long established and necessary business supplying the legitimate needs of a neighborhood or section with much less severity than they will view the first invasion of a purely residential section or neighborhood by any business, especially where that business seeks a foothold on the street frontage of such a neighbor-hood.

"It was early laid down by Judge COOLEY in *Gilbert* v. *Showerman*, 23 Mich. 448, and has been consistently followed as the law in this State through the long line of decisions, including the often cited case of *Ballentine* v. *Webb*, 84 Mich. 38 (13 L. R. A. 321), to the very late case of *Mackenzie* v. *Frank M. Pauli Co.*, 207 Mich. 456, which reviews the earlier decisions, that:

" 'Equity courts ought not to prohibit the conduct of a lawful business by a defendant on his own unrestricted premises except as a last resort to restrain an otherwise unavoidable nuisance existing in violation of complaining party's rights. Where a nuisance is shown, the injunction should be limited to such uses as create the nuisance, leaving the right to carry on the business in the proper manner.   *   *   *   The bare fact that an industry not a nuisance *per se* may not be acceptable as a neighbor to plaintiffs and may produce some discomfort or inconvenience to those near by, will not in itself justify its total elimination by injunction.'

"The decisions relied upon by the plaintiff in his brief are almost without exception in line with these principles.

"In *Ross* v. *Butler*, 19 N. J. Eq. 294, the defendants commenced the erection of a pottery factory on the

line of a street in the residence neighborhood.    A modifying injunction restraining certain uses and practices was issued.    In *Filson* v. *Crawford,* 5 N. Y. Supp. 882, the court's comment on the alleged nuisance amounts to *dicta* because the complainant's bill of complaint was dismissed with costs on other grounds. The *dicta,* however, contains this significant phrase, 'Many stables are undoubtedly kept in large cities in such a manner that they cannot be regarded in law as nuisances.'    In *Lead* v. *Inch,* 116 Minn. 467 (134 N. W. 218, 39 L. R. A. [N. S.] 234, Ann. Cas. 1913B, 891), defendant attempted a new invasion of a residence district with a barn.    A modifying injunction was issued enjoining certain uses and practices.    In *Douglas* v. *City Council of Greenville,* 92 S. C. 374 (75 S. E. 687, 49 L. R. A. [N. S.] 958), the court affirm the police power of the city to regulate the location and use of livery stables by ordinance.    In *Burditt* v. *Swenson,* 17 Tex. 489, the defendants erected a poorly constructed and dangerous wooden building to be used as a livery stable on the street line immediately adjacent to plaintiff's retail store catering to a refined trade.    The court issued a permanent injunction only after a modifying injunction had been disobeyed, and, in view of the 'unreasonable' attitude of the defendant who had refused to accept plaintiff's offer 'to be at the expense of modifying the stable or of building one for them of like dimensions elsewhere,' and who presented the court no brief at the hearing.

"This leaves the plaintiff herein for authority but the two cases of *Templeton* v. *Williams,* and *Rodenhausen* v. *Craven.*    In *Templeton* v. *Williams,* 59 Or. 160 (116 Pac. 1062, 35 L. R. A. [N. S.] 468), it appeared that the defendants offered no willingness to attempt the modified use of their property, as appears in the instant case, and in *Rodenhausen* v. *Craven,* 141 Pa. 546 (21 Atl. 774), the residence street was invaded by a carpet cleaning establishment separated from plaintiff's property by a party wall, and to the annoyance of the stable was added the more disagreeable noises of dust from a blower blown into plaintiff's windows, a vibration of his building by the heavy machinery and the constant noise of escaping steam.

"Cases where stables immediately adjacent to resi-

dence property have been permitted to continue on modification of certain uses are numerous, several of which are referred to in plaintiff's brief. *Kaspar* v. *Dawson*, 71 Conn. 405 (42 Atl. 78) ; *Collins* v. *City of Cleveland*, 2 Ohio Dec. 377 ; *Durfey* v. *Thalheimer*, 85 Ark. 545 (109 S. W. 519) ; *Dubois* v. *Dreyfous*, 52 La. Ann. 1117 (27 South. 663). Applying these principles to the case at bar, the plaintiff has not sustained the burden of proof necessary to warrant this court in ordering the perpetual discontinuance of the use of his stable as a nuisance which cannot be otherwise abated. Defendants constructed the stable in a carefully selected spot isolated by public alleys, contiguous to and as a part of the necessary development of his business, the business being the retail distribution of milk in this section, a fundamental and absolutely essential activity. His good faith is apparent. He expresses a willingness to make any further alterations or change which may be suggested.

"Basing our conclusions on our observations of the premises and the testimony of defendant's experts, however, the defendant shall make the following alterations, in construction and use of the stable, in an effort to further minimize any annoyance and discomfort to the various plaintiffs:

"*First:* The runways of the stable and the floor of the hitching shed now paved with concrete shall be surfaced with some suitable non-porous and water proof compound. "Lapidolith" was suggested by defendant's contractor.

"*Second:* The north side of said hitching shed shall be enclosed by sliding doors if defendant so desires.

"*Third:* The ventilators shall be extended further above the roof, and since this will increase the draft, perhaps a lesser number of them will be needed, especially during the hot weather; the exact height and arrangement is left to the judgment of the defendant.

"*Fourth:* It is suggested that plaintiffs and defendant join in petitioning for the paving of the alley which lies between their respective properties, with creosote block or other noiseless construction.

"*Fifth:* During the hot summer weather the manure shall be removed from the premises daily, stable floor flushed daily and lime used copiously.

"*Sixth:* The routine of entering and leaving the premises shall be rearranged so that the horses be hitched to the wagons on the south side of the shed and shall leave by the southerly alley.

"*Seventh:* Particular caution shall be exercised by the defendant to prevent swearing and loud talking by defendants' employees during the hours of the night and early morning when the horses are being hitched to the wagons.

"The injunction embodying these various orders to the defendants, Charles J. Risdon, and the Risdon Creamery Company may issue. This order, however, is made without prejudice to the plaintiffs, to again bring the situation to the attention of the court if the defendant's use of the premises so warrant.

"No testimony having been offered to connect the defendant Robert McDonald and William Young with the controversy, the bill of complaint is dismissed as to them."

When the plaintiffs Shimberg acquired their property they knew there was a barn on the rear of lot 8 where one or more horses were kept, and where chickens were kept and killed and prepared for market once a week. They knew there were no building restrictions. They also knew that defendants had an established business which it might be presumed would grow, as that part of the city rapidly grew. The plaintiffs were not content with having upon the front part of their lot a single dwelling with a yard or lawn back of it, with a stable and carriage house or a garage next to the alley. Instead of doing this the Shimbergs covered all but 18 feet at the rear of the lot with a building containing apartments which are rented to families. The evidence is conflicting, but it is fairly conclusive that the only apartments where offensive odors are smelled at all are the rear apartments.

We have read with care this voluminous record. We have not had the advantage which the chancellor had

of seeing and hearing the witnesses, and of visiting personally the premises. We are satisfied, however, that the plaintiffs are not entitled to the injunctive relief they seek.

The solicitors for the defendants say in their brief:

"They do not appeal from or refuse to abide by the changes requested by the trial court, but they say these are unnecessary; that the facts adduced do not warrant these changes."

Inasmuch as the defendants have not appealed, they must be content with the decree, which is affirmed, with costs to the defendants.

STEERE, C. J., and WIEST, FELLOWS, STONE, CLARK, BIRD, and SHARPE, JJ., concurred.