# APRIL TERM, 1946.

ROHAN v. DETROIT RACING ASSOCIATION.

1. APPEAL AND ERROR—CHANCERY CASE—DE NOVO REVIEW—ABATE-
   MENT OF NUISANCE—INJUNCTION—CONSTITUTIONALITY OF STAT-
   UTE.
   Suit to abate a nuisance, declare a statute unconstitutional, and
   to secure injunctive relief being a chancery case is reviewed
   *de novo* by the Supreme Court.

2. CONSTITUTIONAL LAW—STATUTES—PRESUMPTIONS.
   A ·statute is presumed to be constitutional and every reasonable
   presumption or intendment must be indulged in favor of its
   constitutionality and it will not be declared invalid unless
   ` it clearly appears to violate some provision of the Constitution.

3. LOTTERIES—PARI-MUTUEL BETTING ON HORSE RACES.
   Pari-mutuel betting on horse races, whereby those who bet on
   the winning horse share the total stakes, less a small share
   to the management, is not a lottery since the distribution is not
   determined by chance, alone, but is affected by the condition,
   speed and endurance of the horse, aided by the skill and man-
   agement of the rider or driver (Const. 1908, art. 5, § 33;
   Act No. 199, Pub. Acts 1933, as amended).

4. SAME—DEFINITION—PRIZES—CONSIDERATION—CHANCE.
   A lottery is a scheme for the distribution of prizes among per-
   sons who have paid or promiséd a consideration for a chance
   to win them, such distribution being by lot or chance and
   not the result of man's choice, will, reason, foresight, sagacity,
   or design.

5. GAMING—PARI-MUTUEL BETTING ON HORSE RACES.
   The pari-mutuel method or system of betting on a horse race
   does not affect or determine the result of the race but is merely
   a convenient mechanical device for recording and tabulating
   information regarding the number and amount of bets.

(326)

6. SAME—PARI-MUTUEL BETTING ON HORSE RACES—CHANCE.

The fact that a better cannot determine the exact amount he may win at the time he places his bet through the pari-mutuel method, because the odds may change during the course of betting on a race, does not make the betting a mere game of chance, since the better can exercise his reason, judgment, and discretion in selecting the horse he thinks will win.

7. SAME—HORSE RACING.

Horse racing is a game of skill and judgment and not a game of chance.

8. LOTTERIES—PARI-MUTUEL BETTING ON HORSE RACES.

Statute which authorizes pari-mutuel betting on horse races does not violate the constitutional prohibition against lotteries (Const. 1908, art. 5, § 33; Act No. 199, Pub. Acts 1933, as amended).

9. CONSTITUTIONAL LAW—POLICE POWER—HORSE RACING.

In the absence of a constitutional prohibition upon horse racing and betting thereon, the State may prohibit or regulate such activities in the exercise of its police power.

10. SAME—STATUTES—HORSE RACING—PUBLIC POLICY.

A statute regulating horse racing and betting thereon establishes the public policy of the State with reference to such activities (Act No. 199, Pub. Acts 1933, as amended).

11. SAME—LEGISLATURE—COURTS—PROPRIETY OF LEGISLATION.

The propriety, wisdom, necessity, utility, and expediency of legislation are exclusive matters for legislative determination and are not for the courts.

12. SAME—PUBLIC POLICY.

The public policy of a State is to be found in its Constitution and statutes.

13. SAME—PUBLIC POLICY—STATUTES.

A statute is conclusive as to the public policy of the State unless it contravenes constitutional provisions.

14. GAMING—BETTING ON HORSE RACES.

Betting on horse races is not *malum in se,* but is only *malum prohibitum.*

15. CONSTITUTIONAL LAW—PUBLIC POLICY—STATUTES.

The public policy of a State, when not fixed by the Constitution, is not unalterable but varies upon any given question with changing legislation thereon.

16. SAME—POLICE POWER—DISCRETION OF LEGISLATURE.

The measures needful or appropriate to be taken in the exercise of the police power are determined by legislative policy and for that purpose a wide discretion is committed to the lawmaking body.

17. SAME—POLICE POWER—GAMING—PUBLIC SAFETY AND WELFARE.

In the exercise of the police power with respect to gaming the legislature may prohibit or only regulate by confining such practices within prescribed limits and have the regulations apply only to those games or wagers in which evil effects appear with greatest prominence, to the end that the public safety and welfare may best be secured.

18. SAME—LEGISLATION—COURTS.

The court may not substitute the personal views and ideas of its members for the wisdom and policy of the legislature as courts have nothing to do with the policy of legislation.

19. GAMING—PARI-MUTUEL BETTING ON HORSE RACES—STATUTES.

Regulations prescribed by statute relating to horse racing and wagering thereon by the pari-mutuel method *held*, not unreasonable, and within the power of the legislature to adopt (Act No. 199, Pub. Acts 1933, as amended).

20. APPEAL AND ERROR—ABATEMENT OF NUISANCE—CONSTITUTIONAL LAW—QUESTIONS REVIEWABLE.

While plaintiffs, seeking to abate as a nuisance the operation of a race track and betting thereon, may not be in a position to raise a question as to the constitutionality of a provision of regulatory statute permitting operation of pari-mutuel machines only at licensed race-track premises, the question is decided in order to conclude the litigation (Act No. 199, Pub. Acts 1933, as amended).

21. STATUTES—GENERAL—SPECIAL—SUBSTANCE—FORM.

In determining whether a law is general or special, the courts look ordinarily to its substance rather than to its form.

22. SAME—APPLICATION TO LIMITED NUMBER.

The mere fact that a law only applies to a limited number does not make it special instead of general in the constitutional sense.

23. SAME—GENERAL IF UNIFORM IN APPLICATION.

A law which is general and uniform in its operation upon all persons in like circumstances is general in a constitutional sense.

24. CONSTITUTIONAL LAW—CLASSIFICATION—UNIFORM APPLICATION
IN CLASS.

Classification is permissible under constitutional provisions for
bidding local or special laws, provided not only the law applies
uniformly to all persons in its operation who are in the same
circumstances, but also that there is a rational basis for put-
ting the persons to whom it applies in a different group from
other persons.

25. STATUTES—VICE OF SPECIAL LAWS.

The vice of a law, as a special law, is that it rests upon a false
and, deficient classification and does not embrace all of the
class to which it is naturally related.

26. CONSTITUTIONAL LAW—CLASS LEGISLATION.

Legislation is not unconstitutional because it is legislation of
a particular kind and character or because it benefits a par-
ticular class if the object and purpose is legitimate and within
the terms of the Constitution and the law operates equally
upon those within the particular class.

27. SAME—CLASSIFICATION IN STATUTES.

The question of classification is primarily for the legislature and
the classification is sufficient if it is practical and reasonable
and is not reviewable unless palpably arbitrary.

28. SAME—EQUAL PROTECTION—CLASSIFICATION.

Equal protection of the laws does not prevent a reasonable classi-
fication by legislative enactment and the ultimate decision
as to the wisdom of such laws rests with the legislature.

29. SAME—CLASSIFICATION PRESUMED REASONABLE.

If any state of facts reasonably can be conceived that would
sustain a statutory classification, its existence must be assumed.

30. GAMING—STATUTES—PARI-MUTUEL BETTING ON HORSE RACES—
POLICE POWER.

The regulation provided by statute, relating to horse racing and
pari-mutuel betting thereon, permitting conduct thereof only
by licensees at the race tracks, is within the police power of
the State and is a reasonable one and, since it applies uni-
form rules of conduct for all persons within the scope of its
application, the act is general and not special (Const. 1908,
art. 5, § 30; Act No. 199, Pub. Acts 1933, as amended).

31. SAME — STATUTES — PARI-MUTUEL MACHINES — BOOKMAKERS —
REGULATION.

Where pari-mutuel machines are permitted only at licensed race
tracks the supervision, regulation and police inspection thereof

is a very simple matter, hence statute permitting their operation there and not elsewhere was not unreasonable in view of the difficulty encountered in police supervision of bookmakers (Act No. 199, Pub. Acts 1933, as amended).

32. CONSTITUTIONAL LAW—STATUTES—POLICE POWER—CLASSIFICATION—NUMBERS AFFECTED.

A statute adopted under the police power is general in effect when it affects all those within a specified class but not all within the jurisdiction, whether or not it is general not being dependent upon the number within the class it purports to regulate nor the number without that class.

33. APPEAL AND ERROR—QUESTIONS REVIEWABLE—PLEADINGS—PARTIES—VALIDITY OF LEASE.

Question as to validity of lease from defendant State department of agriculture to defendant racing association is determined on appeal from decree enjoining defendants from conducting horse races notwithstanding such question was not raised by the pleadings and plaintiffs are not parties to the lease, where trial court declared the lease void because section of statute pursuant to which it had been executed was unconstitutional (Const. 1908, art. 5, § 21; Act No. 199, § 9, Pub. Acts 1933).

34. STATUTES—CONSTITUTIONAL LAW—OBJECT EXPRESSED IN TITLE.

The constitutional requirement that no law shall embrace more than one object, which shall be expressed in its title, is met if an act centers to one main general object or purpose which the title comprehensively declares, though in general terms, and if the provisions in the body of the act not directly mentioned in the title are germane, auxiliary, or incidental to that general purpose (Const. 1908, art. 5, § 21).

35. SAME—OBJECT EXPRESSED IN TITLE—TABLE OF CONTENTS—INDEX.

While the title of an act must cover the general subject matter thereof it need not constitute a table of contents or an index thereof to satisfy the constitutional requirement that an act embrace but one object which shall be expressed in the title (Const. 1908, art. 5, § 21).

36. SAME—TITLE OF ACT—SUBJECT MATTER.

The title of an act is good if it is a descriptive caption, directing attention to the subject matter which follows, or if it be expressive of the purpose and scope of the enactment (Const. 1908, art. 5, § 21).

1946] ROHAN *v.* DETROIT RACING ASSOCIATION.    331

37. SAME—CONSTITUTIONAL LAW—PURPOSE OF REQUIRING OBJECT OF
ACT TO BE EXPRESSED IN TITLE.

The purpose of the constitutional provision that "no law shall
embrace more than one object, which shall be expressed in
its title," was, first, to prevent the bringing together into
one bill subjects diverse in their nature and having no neces-
sary connection, with a view to combine in their favor the ad-
vocates of all, and, second, to challenge the attention of those
affected by the act to its provisions (Const. 1908, art. 5, § 21).

38. SAME—TITLE OF ACT—HORSE-RACING MEETS—REGULATION—
LEASE OF STATE-OWNED LANDS.

Title of act stating that its object and purpose are to regulate
and license horse-racing meets in the State; to create the
office of racing commissioner, prescribe his powers and duties
and provide for his salaries and expenses; to legalize the pari-
mutuel method of betting at licensed race meets; and to ap-
propriate the funds derived therefrom, does not give notice of,
or call attention to, or in any way express or indicate, the
object or purpose of delegating authority to the department
of agriculture to lease State-owned land for the conduct of
horse races (Const. 1908, art. 5, § 21; Act No. 199, § 9,
Pub. Acts 1933).

39. SAME—TITLE OF ACT—HORSE-RACING MEETS—REGULATION—BET-
TING—LEASE OF STATE-OWNED LAND.

Provision of statute authorizing the State department of agri-
culture to lease State-owned land under its control for horse
races is not germane, auxiliary or incidental to the general
object and purpose of the act as expressed in its title which
was to regulate horse-racing meets and betting on horse races
(Const. 1908, art. 5, § 21; Act No. 199, § 9, Pub. Acts 1933).

40. SAME—SEVERANCE OF INVALID PROVISION.

Where a provision of a statute is invalid and severable, the
remainder, being otherwise complete in itself and capable of
being carried out without reference to the unconstitutional
provision, is not affected (Act No. 199, § 9, Pub. Acts 1933;
R. S. 1846, chap. 1, § 5, as added by Act No. 119, Pub. Acts
1945).

41. LANDLORD AND TENANT—STATES—AUTHORITY—VOID LEASE.

A lease executed by the State department of agriculture with-
out authority therefor is void (Act No. 199, § 9, Pub. Acts
1933).

42. NUISANCE—HORSE RACING—VOID LEASE FROM STATE.

The fact that racing association's lease of fair grounds from State department of agriculture was void would not entitle plaintiffs in suit to abate an alleged nuisance arising from horse racing on the fair grounds to injunctive relief nor have any bearing upon claim that the operation of the race track constituted a public or private nuisance (Act No. 199, § 9, Pub. Acts 1933.

43. SAME—STATUTES—PARI-MUTUEL BETTING ON HORSE RACES.

The conduct of horse-racing meets with pari-mutuel betting thereon, declared by the penal code to be common and public nuisances except where expressly allowed by special laws for that purpose, was not such a nuisance where statute pursuant to which such meets were held is constitutional (Act No. 328, § 331, Pub. Acts 1931; Act No. 199, Pub. Acts 1933, as amended).

44. SAME—CONGESTION OF TRAFFIC—RACE TRACK PATRONS.

Congestion of traffic and improper use of streets, alleys, and driveways by patrons of race track meets are matters subject to local police regulation and do not constitute a public nuisance.

45. SAME—PUBLIC NUISANCE—HEALTH.

Since a race track is not a public nuisance *per se* and there was no satisfactory proof that operation of one involved in case was such as to result in conditions affecting the public health or morals to any material extent, the allegation of a public nuisance was not sustained.

46. SAME—PRIVATE NUISANCE—NEGLIGENT OPERATION OF RACE TRACKS AND BARNS—ABATEMENT.

Although a race track is not a nuisance *per se,* where it appears that the track and barns have been operated in such a manner as to subject plaintiffs to flies and insects attracted by the horse stables, annoyances by odor of manure, loud noises and profane language, conduct of employees creating a continuous fire hazard, and parking of automobiles by patrons so as to interfere with traffic in the street and use of plaintiffs' driveway, a common or private nuisance was established which should be abated.

47. SAME—EQUITABLE PROTECTION.

While the court of equity has power to abate nuisances in protection of property rights, and to conserve the enjoyment, health, comfort, and welfare of individuals, it moves with cau-

tion, deciding each case upon its particular facts, and accords protection against injury only in cases where an action at law would afford no adequate redress.

48. SAME—PRIVATE NUISANCE ARISING OUT OF MANNER OF OPERATION OF LEGITIMATE BUSINESS.

If a nuisance is private and arises out of a particular manner of operating a legitimate business, the court will do no more than point to the nuisance and decree adoption of methods calculated to eliminate the injurious features, instead of compelling an abatement of the entire business.

49. APPEAL AND ERROR—NUISANCE—INJUNCTION—ABATEMENT—REMAND.

Decree of trial court which permanently enjoined further operation of race track and which would destroy the business of defendant racing association, which business had been made legitimate by a constitutional statute, is vacated, negligent practices in operation of track and horse barns which gave rise to a common or private nuisance and fire hazard are ordered abated insofar as reasonably possible, and case is remanded to trial court for enforcement and further action deemed necessary and advisable (Act No. 199, Pub. Acts 1933, as amended).

50. COSTS—PUBLIC QUESTION—ABATEMENT OF NUISANCE—CONSTITUTIONAL LAW—STATUTES.

No costs are allowed in suit to abate a nuisance, declare a statute unconstitutional and for injunctive relief, where case involves questions of public importance (Act No. 199, Pub. Acts 1933, as amended).

BUSHNELL, J., dissenting as to approval of present method of conducting the pari-mutuel system.

BUTZEL, C. J., and BOYLES and NORTH, JJ., dissenting as to adjudication that a portion of act was unconstitutional and lease made pursuant thereto was void.

Appeal from Wayne; Miller (Guy A.), J. Submitted January 16, 1946. (Docket No. 45, Calendar No. 43,109.) Decided April 10, 1946. Rehearing denied June 3, 1946.

Bill by Edward J. Rohan and wife against Detroit Racing Association, a Michigan corporation, Michigan State Racing Commission and Department of Agriculture of the State of Michigan to

have Act No. 199, Pub. Acts 1933, declared uncon-
stitutional and to enjoin maintenance of race track
and horse barns. Decree for plaintiffs. Defendants
appeal. Reversed and remanded.

*George E. Day* and *Arnold F. Zeleznik* (*Bert D.
Chandler,* of counsel), for plaintiffs.

*David H. Crowley,* for defendant Detroit Racing
Association.

*John R. Dethmers,* Attorney General, *Edmund E.·
Shepherd,* Solicitor General, and *Ben H. Cole* and
*Daniel J. O'Hara,* Assistants Attorney General, for
Michigan State Racing Commission and Depart-
ment of Agriculture of the State of Michigan.

STARR, J. Defendants appeal from a decree
which determined, among other things, that Act
No. 199, Pub. Acts 1933, as amended,* was uncon-
stitutional, and which permanently enjoined defend-
ants from conducting horse-racing meets with pari-
mutuel betting at the State fair grounds in Detroit.

The material facts are not in dispute. Plaintiffs
Edward J. Rohan and wife have owned and occu-
pied their private residence property on the south
side of West State Fair avenue in Detroit for about
19 years. The Michigan State fair grounds are lo-
cated directly across the street from plaintiffs' resi-
dence. In April, 1921, the Michigan State Agricul-
tural Society conveyed said fair grounds to the
State of Michigan. Thereafter, and until about
1934, the grounds were used for the conducting of
an annual State fair and for other purposes.

---

* Comp. Laws Supp. 1940, § 9234-41 *et seq.,* Stat. Ann. § 18.941
*et seq.* (Amended by Act No. 360, Pub. Acts 1941, Act No. 56,
Pub. Acts 1944 [1st Ex. Sess.], and Act No. 289, Pub. Acts 1945.)

1 Comp. Laws 1929, § 5004 (Stat. Ann. § 12.4)*, provides in part:

"The control of all lands and other property that now is, or hereafter may be, vested in the State of Michigan, or in the people of said State, for the purpose of holding and conducting agricultural and industrial fairs, and for other agricultural purposes, is hereby placed in the State department of agriculture."

In 1933 the legislature adopted Act No. 199, and the constitutionality of that act as amended is involved in the present case. It provided that the terms "commissioner" and "commission" should be construed to mean the Michigan racing commissioner, and in this opinion we shall use the term "commissioner." The act created the office of racing commissioner, provided for his appointment and for the employment of a secretary and necessary assistants. It defined the powers of the commissioner and authorized him to prescribe the rules, regulations, and conditions under which all horse racing should be conducted in Michigan, and also rules governing and regulating betting on horse races. It also provided that the commissioner should fix admission fees and regulate the size of the purses, stakes or rewards to be offered. Section 8 of the act prohibited any person from holding a horse-racing meet for a stake, purse or reward unless licensed by the commissioner. Section 9, after providing for the issuance of licenses to conduct horse-racing meets, further stated as follows:

"The commission shall issue no license or award any dates for racing on any tracks or places for holding races in Michigan, unless such tracks or places have been used for horse racing: Provided,

* Act No. 13, § 4, Pub. Acts 1921.

That the Detroit area shall be permitted one new track within twenty-five miles of the corporate limits of the city of Detroit, and one new track more than twenty-five miles and less than forty miles from Wayne county, which shall be eligible for license under this act in the discretion of the commission: Provided, however, That if the Michigan State fair track is unavailable or inadequate properly to accommodate such horse racing in the opinion of the commission, then the commission may grant license for not more than two new tracks located not more than twenty-five miles from the corporate limits of the city of Detroit. The intent and purpose of the above provisos is that no new or additional tracks or places for holding races shall be licensed or awarded dates for holding or conducting races and thus bring into profitable use the State, district and county fair tracks of this State. *The State department of agriculture is hereby authorized to lease on behalf of the State, for the conduct of horse racing and other lawful purposes, any lands subject to the control of the said department of agriculture, said lease to be subject to the approval of the State administrative board.*"

Section 13 of the act provided that any licensee conducting a horse-racing meet may provide a place in the race-meeting enclosure for the conducting and supervision of the pari-mutuel system of wagering, and further provided that the pari-mutuel system "shall not under any circumstances be held or construed to be unlawful, other statutes of the State of Michigan to the contrary notwithstanding." Section 14 provided that no other place or method of betting shall be permitted by the licensee of the race track. It also provided that the licensee could retain as a commission the "breaks" and not less than 6 and not to exceed 7½ per cent. of the money wagered. This section was amended by Act No. 56,

Pub. Acts 1944 (1st Ex. Sess.)* to provide that the licensee could retain as a commission the breaks "computed at 5 cents," and also 10 per cent. of the money wagered. Section 16 of the act provided that any applicant for a license to hold horse races should pay a license tax to be fixed by the commissioner and that for running races on mile tracks in the Detroit area the tax should be not less than $2,500 nor more than $5,000 for each day of racing. This section was amended by Act No. 56, Pub. Acts 1944 (1st Ex. Sess.), and Act No. 289, Pub. Acts 1945,† to read in part as follows:

"Each licensee under this act shall pay a daily racing tax in accordance with the following schedule for the various types of racing, and in such manner and time as the commission shall require: * * *
"For running races the license tax shall be:
"State Pari-mutuel Tax.
"2% of the pari-mutuel pool up to $200,000.
"6% of the pari-mutuel pool over $200,000 and up to $400,000.
"8% of the pari-mutuel pool over $400,000."

In pursuance of the above-quoted provision in section 9 of the act, the State department of agriculture on December 18, 1934, leased a portion of the State fair grounds to defendant Detroit Racing Association for the period from May 1, 1935, to November 1, 1948, at an annual rental of $12,000. In addition to the above rental, the lease further provided that the lessee would "conduct horse racing on the * * * premises for not less than 60 days in each year of the term of this lease, and pay therefor a license fee of $2,500 per day." This lease was

---

* Comp. Laws Supp. 1945, § 9234–54, Stat. Ann. 1945 Cum. Supp. § 18.954.
† Comp. Laws Supp. 1945, § 9234–56, Stat. Ann. 1945 Cum. Supp. § 18.956.

approved by the State administrative board. In August, 1939, it was amended in some particulars not important to decision in the present case. About 1934 defendant Detroit Racing Association rebuilt the grand stand and built nine horse barns on the premises which it leased from the department of agriculture, and in 1935 it built two additional barns. These 11 barns were located two to three hundred feet north of a wire fence which marked the southern boundary of the fair grounds along west State Fair avenue. Since 1934 the association has annually conducted horse-racing meets on the premises, and has operated the so-called pari-mutuel system of betting on the races. Under this system bets are made on horses through ticket-selling machines leased or owned by the racing association. Bets made through these machines are relayed to a central control room where employees manually determine the approximate odds on the horses running, which odds are posted on a field board for observation by patrons of the race track. The computation of odds, the amount to be paid upon each "win," and the total amount paid upon each race are checked by auditors employed by defendant racing commissioner. Each day during the racing meet the amounts due the State and defendant racing association from the proceeds of the pari-mutuel betting are determined. The races are conducted under rules and regulations prescribed by the racing commissioner.

The two barns built in 1935 were destroyed by fire in 1944, and defendant racing association began the construction of a new barn at a point 35 to 50 feet north of the wire fence along west State Fair avenue. In August, 1944, while the erection of this new barn was in progress, plaintiffs filed bill of complaint in the present suit, naming the Michigan

State racing commission and the Detroit Racing
Association as defendants.  In their bill they alleged
that the construction and use of the new barn would
subject them to odors, noise, and other unpleasant-
ness; would create a fire menace to their property;
and would create a public and also a common nui-
sance.  They sought a decree determining that Act
No. 199, Pub. Acts 1933, was unconstitutional and
void; and that the construction and use of the new
barn created a public and common nuisance.  They
asked that defendants be permanently enjoined
from constructing and maintaining said barn for
the housing of horses and from operating said race
track.  Upon the filing of this bill the trial court or-
dered defendants to show cause why a temporary in-
junction should not be issued as prayed for.  The
defendants named in the bill filed answers denying
in substance that the operation of the race track and
the construction and use of the new barn constituted
a fire hazard or a common and public nuisance.
They denied plaintiffs' right to injunctive relief and
asked that the bill be dismissed.

On September 1, 1944, plaintiffs filed an amended
bill in which they added the department of agricul-
ture of the State of Michigan as a party defendant.
They alleged that the operation of the race track
and the use of the several barns on the premises
created a common and public nuisance.  They also
alleged that under 3 Comp. Laws 1929, § 16621,* the
operation of the race track constituted a common

---

* This section was repealed, but was reenacted, with amendment,
by Act No. 328, § 331, Pub. Acts 1931 (penal code), to read in
part as follows:

"All running, trotting or pacing of horses, or any other animals,
for any bet or stakes, in money, goods or other valuable thing, ex-
cepting such as are by special laws for that purpose expressly al-
lowed, shall be deemed racing within the meaning of this section,
and are hereby declared to be common and public nuisances."
(Comp. Laws Supp. 1940, § 17115–331, Stat. Ann. § 28.563.)

and public nuisance. They asked that Act No. 199 be declared unconstitutional and that the defendants be permanently enjoined from operating the race track. Defendants answered, denying plaintiffs' right to the relief sought and asking for dismissal of the amended bill.

A hearing was had on the order to show cause, and testimony was taken. Following this hearing the trial court filed an opinion on November 17, and a supplemental opinion on November 22, 1944, in which he denied plaintiffs' prayer for a temporary injunction, but in which he determined, among other things, that Act No. 199, Pub. Acts 1933, was unconstitutional on the ground that it authorized a lottery in violation of article 5, § 33, of the State Constitution (1908).

On the trial evidence was presented relative to the leasing of a portion of the State fair grounds to defendant racing association, the improvement of said premises by the rebuilding of the grand stand and erection of horse barns, and relative to the operation of the race track and pari-mutuel betting machines. Plaintiffs also presented testimony that the operation of the horse barns at the race track subjected them to offensive manure odors and to flies; that the use of the barns created a fire hazard; that the parking of cars by patrons of the race track caused traffic congestion and interfered with plaintiffs' use of their driveway and property; and that they were subjected to noise, profane language, and other offensive conditions occasioned by the use of said barns and operation of the race track. Much of the voluminous record is composed of testimony wholly irrelevant and immaterial to the issues involved. At the conclusion of the trial the court filed a further opinion in which he determined that said Act No. 199 was unconstitutional; that the lease

from the State department of agriculture to defendant racing association was void; that the operation of the race track with pari-mutuel betting constituted a public nuisance; and that the operation of the race track and horse barns created a common or private nuisance. A decree was entered permanently enjoining defendants from further operation of the race track.

The defendants appealed from this decree, and on their motion an order was entered in this court staying the injunction pending appeal, on condition, however, that they maintain covers enclosing all manure receptacles at the barns, disinfect said receptacles, remove all manure from the premises every 24 hours, and on condition that they police the horse barns and adjacent grounds so as to minimize, so far as possible, all fire hazards, disturbances, and improper conduct. This being a chancery case, we review *de novo.*

The first question presented is whether or not Act No. 199, Pub. Acts 1933, is unconstitutional as authorizing a lottery in violation of article 5, § 33, of the State Constitution (1908), which provides that "the legislature shall not authorize any lottery nor permit the sale of lottery tickets." In short, the question is whether or not the pari-mutuel system of betting on horse races, as authorized by said Act No. 199 and as conducted by defendant racing association, is a "lottery" within the meaning of the constitutional prohibition. The statute is presumed to be constitutional, and every reasonable presumption or intendment must be indulged in favor of its constitutionality. In *City of Highland Park* v. *Oakland County Drain Commissioner,* 312 Mich. 407, we quoted with approval from *Cady* v. *City of Detroit,* 289 Mich. 499, 505, as follows:

"A statute will be presumed to be constitutional by the courts unless the contrary clearly appears;

and in case of doubt every possible presumption not clearly inconsistent with the language and the subject matter is to be made in favor of the constitutionality of legislation. * * * Every reasonable presumption òr intendment must be indulged in favor of the validity of an act, and it is only when invalidity appears so clearly as to leave no room for reasonable doubt that it violates some provision of the Constitution that a court will refuse to sustain its validity. A statute is presumed to be constitutional and it will not be declared unconstitutional unless clearly so, or so beyond a reasonable doubt."

We are convinced that under the great weight of authority, pari-mutuel betting on horse races is not a lottery. Webster's New International Dictionary (2d Ed.), défines a lottery as follows:

"A scheme for the distribution of prizes by lot or chance; * * * a scheme by which one or more prizes are distributed by chance among persons who have paid or promised a consideration for a chance to win them, usually as determined by the numbers on tickets as drawn from a lottery wheel."

Said dictionary defines pari mutuel as "a form of betting on horses in which those who bet on the winning horse share the total stakes, less a small per cent. to the management." It describes a parimutuel machine as "a machine for registering and indicating the number and nature of bets made on horse races, used in the pari-mutuel system of betting."

In the case of *People* v. *Reilly,* 50 Mich. 384 (45 Am. Rep. 47), the defendant was convicted under an ordinance of the city of Detroit which prohibited the maintaining of any "lottery, policy, pool, bucket-shop, board of trade, or any like scheme or place for drawing or disposing of money, wheat, or other property within the city." In holding that

betting on horse races and on baseball matches did not constitute a lottery in violation of the constitutional provision prohibiting a lottery, the court said (pp. 385, 387, 388):

"The offense which the recorder finds respondent to have committed consisted in what seems to be commonly known as pool-selling, and the facts indicate that the pools were made up of amounts bid for the privilege of selecting horses out of those running in races, and of bets of as many as saw fit to do so, by purchasing checks deposited on baseball matches, where those who bet on the winning combination received the pool.  *  *  *

"By the Constitution of 1835 (art. 12, § 6) it was provided that 'no lottery shall be authorized by this State, nor shall the sale of lottery tickets be allowed.'  *  *  *

"We think that it would be straining the law to include such acts as those of the respondent within the category of lotteries, and therefore we must treat the case as one which has not been placed by the legislature under the classification of offenses which should be left to be dealt with by the municipal by-laws and ordinances, as well as by State laws."

In *People* v. *Elliott,* 74 Mich. 264 (3 L. R. A. 403, 16 Am. St. Rep. 640), this court described a lottery as follows (pp. 267, 268):

"A lottery is a scheme by which a result is reached by some action or means taken, and in which result man's choice or will has no part, nor can human reason, foresight, sagacity, or design enable him to know or determine such result until the same has been accomplished.  *  *  *

"It is thought by counsel for defendant that this case is ruled by *People* v. *Reilly,* 50 Mich. 384 (45 Am. Rep. 47).  *  *  *  That case, however, is different. There the contingency was one upon which

the parties interested could exercise their reason and judgment under an agreement upon which the money was paid, and was in its nature executory. In this case the money was paid when the chance was obtained, and there was no opportunity for exercising the reason or judgment or any other faculty of the mind, and hence the lottery.''

In *Glover* v. *Malloska,* 238 Mich. 216, 219 (52 A. L. R. 77), we said that the essentials of a lottery were ''consideration, prize, and chance.'' See, also, *Sproat-Temple Theatre Corp.* v. *Colonial Theatrical Enterprise, Inc.,* 276 Mich. 127; *People* v. *Welch,* 269 Mich. 449; *People* v. *Wassmus,* 214 Mich. 42; *People* v. *McPhee,* 139 Mich. 687 (69 L. R. A. 505, 5 Ann. Cas. 835). In 38 C. J. pp. 286–290, it is stated:

''Whether coming up for construction in a criminal prosecution or in a civil proceeding, * * * it (lottery) is, therefore, a species of gambling, which may be defined as a scheme for the distribution of prizes or things of value by lot or chance among persons who have paid, or agreed to pay, a valuable consideration for the chance to obtain a prize; or as a game of hazard in which small sums of money are ventured for the chance of obtaining a larger value, in money or other articles. * * *

''In conformity with the definitions already stated it is obvious, as has been repeatedly stated, that the three necessary elements of a lottery are the offering of a prize, the awarding of the prize by chance, and the giving of a consideration for an opportunity to win the prize. * * *

''Chance is an essential element of a lottery in the sense that, unless a scheme for the awarding of a prize requires that it be awarded by chance, it is not a lottery.''

See, also, *Peek* v. *United States* (C. C. A.), 61 Fed. (2d) 973.

In the case of *People* v. *Monroe,* 349 Ill. 270 (182 N. E. 439, 85 A. L. R. 605), the court determined that a State statute referred to as the horse-racing act,* which provided for pari-mutuel betting on the result of horse races, did not violate a provision of the State Constitution prohibiting lotteries.   In its opinion the court said (pp. 272, 275, 277):

"The only issue in the case is the constitutionality of the horse racing act.   *   *   *

"The pari-mutuel system of betting does not come within the definitions (of lottery) given above. While the amount of money to be divided is indefinite as to dollars and cents, it is definite in that the amount of money to be divided is the total stakes on the winning horse, less a given percentage to the management.   The persons among whom the money is to be divided are not uncertain, as they are 'those who bet on the winning horse.'   The winning horse is not determined by chance, alone, but the condition, speed and endurance of the horse, aided by the skill and management of the rider or driver, enter into the result.   *   *   *   *In our opinion the pari-mutuel system does not come within the constitutional inhibition as to lotteries.*   *   *   *

"In horse racing the horses are subject to human guidance, management and urging to put forth their best efforts to win."

In the case of *Commonwealth* v. *Kentucky Jockey Club,* 238 Ky. 739 (38 S. W. [2d] 987), a statute permitting pari-mutuel betting on horse races was held to be constitutional and not in violation of a provision of the State Constitution prohibiting lotteries.   See, also, *Utah State Fair Ass'n* v. *Green,* 68 Utah, 251 (249 Pac. 1016); *Panas* v. *Texas Breeders & Racing Ass'n, Inc.* (Tex. Civ. App.), 80 S. W. (2d) 1020; *State* v. *Thompson,* 160 Mo. 333 (60 S. W. 1077, 83 Am. St. Rep. 468, 54 L. R. A. 950); *Engle* v. *State of Arizona,* 53 Ariz. 458 (90 Pac. [2d]

---

* Smith-Hurd Rev. Stat. 1931, chap. 8, §§ 37a-37q.

988); *Stoddart* v. *Sagar,* 64 L. J. (M. C.) 234 (2 Q. B. [1895] 474, 73 L. T. 215); *Caminada* v. *Hulton,* 60 L. J. (M. C.) 116 (64 L. T. 572).

Under the above authorities it is clear that parimutuel betting on a horse race is not a lottery. In a lottery the winner is determined by lot or chance, and a participant has no opportunity to exercise his reason, judgment, sagacity or discretion. In a horse race the winner is not determined by chance alone, as the condition, speed, and endurance of the horse and the skill and management of the rider are factors affecting the result of the race. The better has the opportunity to exercise his judgment and discretion in determining the horse on which to bet. The pari-mutuel method or system of betting on a horse race does not affect or determine the result of the race. The pari-mutuel machine is merely a convenient mechanical device for recording and tabulating information regarding the number and amount of bets *(Utah State Fair Ass'n v. Green, supra),* and from this information the betting odds on the horses entered can be calculated and determined from time to time during the process of betting. The recording and tabulating of bets could be done manually by individuals, but the pari-mutuel machine is a more convenient and faster method. The fact that a better cannot determine the exact amount he may win at the time he places his bet, because the odds may change during the course of betting on a race, does not make the betting a mere game of chance, since the better can exercise his reason, judgment, and discretion in selecting the horse he thinks will win. Horse racing, like foot racing, boat racing, football, and baseball, is a game of skill and judgment and not a game of chance. *Utah State Fair Ass'n* v. *Green, supra.*

Therefore, we conclude that Act No. 199, Pub. Acts 1933, authorizing pari-mutuel betting on horse

races, does not violate the constitutional prohibition against lotteries.

Plaintiffs next contend that horse racing with pari-mutuel betting is not a legitimate business and that it was not within the police power of the State to regulate it. In his opinion the trial court said: "Neither the courts nor the legislature have a right to put the State into an immoral business." There is no constitutional prohibition against horse racing and betting thereon. Therefore, the State, in the exercise of its police power, may prohibit or regulate these activities. By Act No. 199 the legislature sought to regulate horse racing and betting, and the public policy of the State was established by this enactment.

"One of the most firmly established groups of principles which has become cardinal and elementary in the field of constitutional law is that the propriety, wisdom, necessity, utility, and expediency of legislation are exclusively matters for legislative determination." 11 Am. Jur. p. 804, § 138.

"It is generally recognized that the public policy of a State is to be found in its Constitution and statutes. * * *

"The rule has become securely settled that all questions of policy are for the determination of the legislature, and not for the courts. * * *

"A statute is conclusive as to the public policy of the State unless it contravenes constitutional provisions." 11 Am. Jur. pp. 813, 815, 816, § 139.

"It is contended by plaintiff in error that the act here in question is contrary to the public policy of the State of Illinois. Betting on horse races is not *malum in se* but is only *malum prohibitum.* It is not prohibited by the constitution. The public policy of a State, when not fixed by the Constitution, is not unalterable but varies upon any given question with changing legislation thereon." *People* v. *Monroe, supra,* pp. 275, 276.

"The measures needful or appropriate to be taken in the exercise of this police power are determined by legislative policy, and for this purpose a wide discretion is committed to the law-making body. Whether it shall entirely prohibit or only regulate by confining such practices within prescribed limits,—whether the law shall apply to every kind of gambling, or only to those games or wagers in which evil effects appear with greatest prominence,—must be determined primarily by the legislative department of the State, or of the municipality authorized to exercise this great power, which is conferred for the purpose of securing the public safety and welfare." *Ex parte Tuttle,* 91 Cal. 589 (27 Pac. 933).

In *C. F. Smith Co.* v. *Fitzgerald,* 270 Mich. 659, 671, we said:

"The court may not substitute the personal views and ideas of its members for the wisdom and policy of the legislature. Courts have nothing to do with the policy of legislation."

See, also, *Auditor General* v. *Hall,* 300 Mich. 215 (139 A. L. R. 1022); *Cady* v. *City of Detroit, supra; Naudzius* v. *Lahr,* 253 Mich. 216 (74 A. L. R. 1189, 30 N. C. C. A. 179); 1 Cooley on Constitutional Limitations (8th Ed.), pp. 183–188.

We conclude that the legislature, in the exercise of its police power, could regulate horse racing and wagering thereon by the adoption of Act No. 199. The regulations prescribed in this act are not unreasonable.

The next question presented is whether or not Act No. 199, Pub. Acts 1933, authorizing and regulating horse racing and pari-mutuel betting is a local or special act in violation of article 5, § 30, of the State Constitution (1908), which provides in part: "The legislature shall pass no local or special act in any case where a general act can be made applicable."

It is contended that the act is local or special because it permits a licensed race-track operator to conduct pari-mutuel betting on the race-track premises, while those conducting the same activity outside the premises would be subjected to prosecution for violation of a penal statute (Act No. 328, § 301, Pub. Acts 1931 [penal code] [Comp. Laws Supp. 1940, § 17115–301, Stat. Ann. § 28.533]). Plaintiffs argue that the act is unreasonable and arbitrary and provides for an improper classification by conferring a special privilege upon licensees under the act. It could be argued with considerable force that plaintiffs are not in a position to raise this particular question of constitutionality, because they are not members of the class against which the alleged discrimination would operate, that is, they are not persons seeking to conduct pari-mutuel betting outside the race-track premises. See *General Motors Corp.* v. *Attorney General,* 294 Mich. 558 (130 A. L. R. 429); *Thomas* v. *Morton Salt Co.,* 258 Mich. 231; *Schneider* v. *City of Grand Rapids,* 211 Mich. 399. However, we believe that in order to conclude the present litigation, this particular question should be decided. The general rule for determining whether a legislative enactment is general or special in character is stated in 12 Am. Jur. pp. 238, 239, § 541, as follows:

"In determining whether a law is general or special, the courts look ordinarily to its substance rather than to its form.   *   *   *

"The mere fact that a law only applies, however, to a limited number does not make it special instead of general. It may be general within the constitutional sense and yet, in its application, only affect one person or one place. Because its right and protection cannot be enjoyed by every citizen does

not make it unconstitutional. If the law is general and uniform in its operation upon all persons in like circumstances, it is general in a constitutional sense. Laws are general and uniform not because they operate on every person in the State, but because they operate on every person who is brought within the relations and circumstances provided for—not because they embrace all of the governed, but because they may embrace all—if the persons governed occupy the position of those who are embraced. Classification is permissible under constitutional provisions forbidding local or special laws, provided not only the law applies uniformly to all persons in its operation who are in the same circumstances, but provided there is a rational basis for putting the persons to whom it applies in a different group. from other persons. Therefore, the rule is settled that a statute relating to persons or things as a class is a general law, but a statute relating to particular persons or things of a class is special. Under this rule it is apparent that in every case the vice of a law, as a special law, is that it rests upon a false and deficient classification and does not embrace all of the class to which it is naturally related.''

In the case of *In re Brewster Street Housing Site,* 291 Mich. 313, 339, we stated:

''Legislation is not unconstitutional because it is legislation of a particular kind and character, or because it benefits a particular class. If the object and purpose of the legislation is legitimate and within the terms of the Constitution, the mere fact that there is classification, so long as the law operates equally upon those within the particular class, does not render it unconstitutional.''

In the case of *Miller* v. *Detroit Savings Bank,* 289 Mich. 494, 497, we said:

''The question of classification is primarily for the legislature and is sufficient if it is practical and

reasonable. It is not reviewable unless palpably arbitrary. *Straus* v. *Elless Co.*, 245 Mich. 558. Equal protection of the laws does not prevent a reasonable classification by legislative enactment and the ultimate decision as to the wisdom of such laws rests with the legislature. *Little* v. *American State Bank of Dearborn*, 263 Mich. 645.

" 'A citation of cases is not necessary, nor for the general principle that a discrimination is valid if not arbitrary, and arbitrary in the legislative sense, that is, outside of that wide discretion which a legislature may exercise. A legislative classification may rest on narrow distinctions. Legislation is addressed to evils as they may appear, and even degrees of evil may determine its exercise.' *German Alliance Ins. Co.* v. *Lewis,* 233 U. S. 389, 418 (34 Sup. Ct. 612, 58 L. Ed. 1011, L. R. A. 1915C, 1189).

"If any state of facts reasonably can be conceived· that would sustain statutory classification, its existence must be assumed. *Naudzius* v. *Lahr,* 253 Mich. 216 (74 A. L. R. 1189, 30 N. C. C. A. 179)."

The question as to whether said Act No. 199 is a general or special act does not depend upon the number of persons within the class it purports to regulate or upon the number without that class. It is a general act if it applies uniform rules of conduct for all those persons within the scope of its application. It is clear that Act No. 199 applies uniformly and indiscriminately to all persons within the class, that is, to all persons conducting pari-mutuel betting at horse-racing tracks in Michigan. It is within the police power of the State to provide reasonable regulation of this activity. The evils attendant upon this type of wagering are well known, and by the act in question the legislature in the exercise of its discretion sought to regulate the wagering by confining it to race tracks con-

ducted by licensees. The regulation provided by the act was not unreasonable or arbitrary and was within the scope of legislative power and discretion.

In upholding the California horse-racing act (Stats. 1933, p. 2046 [Deering's Gen. Laws, 1937, Act No. 3421]), which permitted betting at duly-licensed horse-racing tracks by means of pari-mutuel betting machines, the court stated in *People* v. *Sullivan,* 60 Cal. App. (2d) 539 (141 Pac. [2d] 230), as follows (pp. 541, 545):

"When the subject of legislation falls under the police powers of the State, activities may be prohibited altogether, limited as to place and location, or, where operation is permitted, may be regulated by rules of conduct. These laws enacted under the police powers must be subject to the restriction that the prohibition, limitation or regulation, must apply to all alike who come within a reasonable classification of persons or property.  *  *  *

"Many reasons suggest themselves which support the reasonableness of the classification made by the legislature. Pari-mutuel machines are only permitted at licensed race tracks where supervision, regulation and police inspection and control is a very simple matter. These machines are mechanical devices in which the odds are determined with mathematical certainty and pay-offs to the lucky are assured. On the other hand bookmaking establishments were conducted in any place where the operators might believe patrons would collect. Odds were established by the bookmakers and any reasonable police supervision was difficult.  *  *  *  (Authorities cited.)  *  *  *

"Under the foregoing authorities we are required to conclude that the classification made by the legislature is reasonable and was made on constitutional grounds and that it may not be disturbed here. It is clear that a law adopted under the police powers is general in effect when it affects all those within

a specified class but not all within the jurisdiction. The question of its being general in its application does not depend on the number within the class it purports to regulate nor the number without that class. It is general and not unconstitutional when, as here, it applies uniform rules of conduct for all those coming within the scope of its application and may not be challenged because of any denial of equal protection of the law to those on whom it operates because others differently situated and within a different legal classification may not be affected by its terms."

See, also, *Straus* v. *Elless Co.*, 245 Mich. 558; *People* v. *Maddox,* 65 Cal. App. (2d) 45 (149 Pac. [2d] 739); *People* v. *Monroe, supra; State* v. *Thompson, supra; Commonwealth* v. *Kentucky Jockey Club, supra; Debardelaben* v. *State,* 99 Tenn. 649 (42 S. W. 684); *Utah State Fair Ass'n* v. *Green, supra.*

We conclude that Act No. 199, Pub. Acts 1933, does not create an arbitrary or unreasonable classification and that the licensing of race-track operators and the regulation of pari-mutuel betting was a reasonable exercise of the State's police power. This statute is not a special or local act prohibited by article 5, § 30, of the State Constitution.

Question is also raised as to the validity of the lease from defendant department of agriculture to defendant racing association. It should be noted that plaintiffs do not, in their bill of complaint or amended bill, question the validity of the lease. However, the trial court held it to be void on the ground that the portion of section 9 of Act No. 199 which authorized the department of agriculture to lease any lands under its control for "the conduct of horse racing" was unconstitutional, because in contravention of article 5, § 21, of the State Consti-

tution (1908), which provides: No law shall embrace more than one object, which shall be expressed in its title.''

Defendants contend that because this question as to the validity of the lease was not raised by the pleadings, it should not be reviewed on appeal. *Lafayette Dramatic Productions, Inc.*, v. *Ferentz*, 305 Mich. 193 (145 A. L. R. 1158); *Makar* v. *Peoples Wayne County Bank of Dearborn*, 284 Mich. 489; *Roepcke* v. *Railroad Co.*, 100 Mich. 541. They also argue that plaintiffs, who are not parties to the lease, cannot collaterally attack its validity. However, as the trial court held the lease to be void because of the unconstitutionality of the provision in section 9 authorizing the department of agriculture to lease, we deem it advisable and proper to determine the question at this time. *Meek* v. *Wilson*, 283 Mich. 679. The precise question is whether or not the provision of Act No. 199, § 9, authorizing the leasing of State-owned land for ''the conduct of horse racing,'' embraces an object not expressed in the title of the act. In other words, is this leasing provision germane, auxiliary or incidental to the general object of the act as expressed in its title, which provides:

''An act to provide, regulate and license the conducting of racing meets in the State of Michigan; to create the office of Michigan racing commissioner, to prescribe his powers and duties and to provide for his salary and expenses; to legalize and permit auction pools, the pari-mutuel or certificate method of wagering on the result of races at licensed race meetings in the State of Michigan; to appropriate the funds derived therefrom; to render inapplicable all acts or parts of acts in conflict therewith, and to provide penalties for the violation thereof.''

The rule for determining this question of constitutionality was stated in *Loomis* v. *Rogers,* 197 Mich. 265, 271, as follows:

"If the act centers to one main general object or purpose which the title comprehensively declares, though in general terms, and if provisions in the body of the act not directly mentioned in the title are germane, auxiliary, or incidental to the general purpose, the constitutional requirement is met."

In *People, ex rel. Wayne Prosecuting Attorney,* v. *Sill,* 310 Mich. 570, 574, we said:

"The well-established rules of construction are that an act is not violative of the above constitutional provision if its title fairly covers the general subject matter of the act. A title is sufficient in detail even though it does not constitute a table of contents or an index to the act. See *City of Bay City* v. *State Board of Tax Administration,* 292 Mich. 241. The title is good if it is a descriptive caption, directing attention to the subject matter which follows, *Loomis* v. *Rogers,* 197 Mich. 265; or if it be expressive of the purpose and scope of the enactment, *In re Lewis' Estate,* 287 Mich. 179, 183."

See, also, *Michigan Boiler & Sheet Iron Works, for use and benefit of American Mutual Liability Co.,* v. *Dressler,* 286 Mich. 502; *People* v. *Sowall,* 279 Mich. 261; *Krench* v. *State of Michigan,* 277 Mich. 168.

In discussing said article 5, § 21, of the Constitution, in the majority opinion in *Commerce-Guardian Trust & Savings Bank* v. *State of Michigan,* 228 Mich. 316, 330, 331, we stated:

"This provision was adopted in our first Constitution, and has remained in the several subsequent revisions without change. Its purpose and

the effect to be given to it by the legislature have been many times discussed and passed upon by this court. It may be said at the outset that the provision is designed to serve two purposes. *First,* to prevent action by the legislature without receiving the concurrence therein of the requisite number of members by—'bringing together into one bill subjects diverse in their nature, and having no necessary connection, with a view to combine in their favor the advocates of all.'—What is commonly spoken of as log-rolling in legislation—and also to prevent clauses being—'inserted in bills of which the titles gave no intimation, and their passage secured through legislative bodies whose members were not generally aware of their intention and effect.' *People, ex rel. Drake,* v. *Mahaney,* 13 Mich. 481, 494. And, *second,* to 'challenge the attention' of those affected by the act to its provisions. *People* v. *Wohlford,* 226 Mich. 166, 168.''

Applying the above-quoted constitutional prohibition to the title and provisions of Act No. 199, § 9, the following questions are presented: (1) Does the title of the act give the legislature and the public fair notice that the act contains a provision delegating to the department of agriculture authority to lease State-owned land, such as the Detroit fair grounds, for "the conduct of horse racing"? (2) Does the body of the act embrace more than one object?

The title of the act clearly states that its object and purpose are to regulate and license horse-racing meets in this State; to create the office of racing commissioner; to prescribe his powers and duties; to provide for his salary and expenses; to legalize the pari-mutuel method of betting at licensed race meets; and to appropriate the funds derived therefrom. We are convinced that the wording of the title of the act does not give notice of, or call atten-

tion to, or in any way express or indicate, the object or purpose of delegating authority to the department of agriculture to lease State-owned land for the conduct of horse racing. *Vernor* v. *Secretary of State,* 179 Mich. 157 (Ann. Cas. 1915D, 128); *Shepherd* v. *Judge of the Recorder's Court of the City of Detroit,* 175 Mich. 193; *Chambers* v. *City of Grand Ledge,* 162 Mich. 344; *Bresler* v. *Delray Real Estate & Investment Ass'n,* 156 Mich. 3 (132 Am. St. Rep. 516); *People* v. *Gadway,* 61 Mich. 285 (1 Am. St. Rep. 578). The provision in section 9 of the act authorizing the department of agriculture to lease State-owned land under its control is not germane, auxiliary or incidental to the general object and purpose of the act as expressed in its title, which was to regulate horse-racing meets and betting on horse races. *Price* v. *Township Board of Oakfield Township,* 182 Mich. 216; *City of Grand Rapids* v. *Judge of the Superior Court of Grand Rapids,* 93 Mich. 469; *Eaton* v. *Walker,* 76 Mich. 579 (6 L. R. A. 102); *Northwestern Manfg. Co.* v. *Wayne Circuit Judge,* 58 Mich. 381 (55 Am. Rep. 693); *West Virginia Pulp & Paper Co. of Delaware* v. *Peck,* 104 Misc. 172 (171 N. Y. Supp. 1065); *People, ex rel. Failing,* v. *Commissioners of Highways,* 53 Barb. (N. Y.) 70.

We accordingly conclude that the last sentence of said section 9, which purports to authorize the department of agriculture to lease State-owned land under its control for "the conduct of horse racing," is unconstitutional. However, this sentence or provision of section 9 is severable, and our holding that it is invalid shall not affect or interfere with the remaining portions of said Act No. 199, which is otherwise complete in itself and capable of being carried out without reference to the unconstitutional sentence or provision. The severance clause

in section 24 of the act was repealed by Act No. 267, § 4, Pub. Acts 1945 (Comp. Laws Supp. 1945, § 121–6, Stat. Ann. 1945 Cum. Supp. § 2.354). However, Act No. 119, Pub. Acts 1945,* provided as follows:

"In the construction of the statutes of this State the following rules shall be observed, unless such construction would be inconsistent with the manifest intent of the legislature, that is to say:

"If any portion of an act or the application thereof to any person or circumstances shall be found to be invalid by a court, such invalidity shall not affect the remaining portions or applications of the act which can be given effect without the invalid portion or application, provided such remaining portions are not determined by the court to be inoperable, and to this end acts are declared to be severable."

See, also, *People* v. *McMurchy,* 249 Mich. 147; *Klatt* v. *Wayne Probate Judge,* 159 Mich. 203.

The department of agriculture had no authority under Act No. 199 to lease a part of the State fair grounds in Detroit to defendant racing association, and its unauthorized lease thereof is void. This holding merely leaves defendant racing association in the position of a lessee holding under a void lease. Our holding that the lease is void does not entitle plaintiffs to the injunctive relief which they sought, nor does it have any bearing upon their claim that the operation of the race track constituted a public or private nuisance.

Plaintiffs further contend that the operation of the race track with pari-mutuel betting constitutes a public nuisance. They base this contention upon

---

* Rev. Stat. 1846, chap. 1, § 5, as added by Act No. 119, Pub. Acts 1945 (Comp. Laws Supp. 1945, § 77–3, Stat. Ann. 1945 Cum. Supp. § 2.216).

the claim that Act No. 199 is unconstitutional and that, therefore, the operation of the track with pari-mutuel betting was a public nuisance under Act No. 328, § 331, Pub. Acts 1931 (penal code), hereinbefore quoted. As we have herein held said Act No. 199 (except the above-discussed provision in section 9) to be constitutional, this contention is without merit. Plaintiffs also claim that the congestion of traffic and the improper use of streets, alleys, and driveways by patrons of the race track creates a public nuisance. These are matters subject to local police regulation and do not constitute a public nuisance. There was no satisfactory proof that the operation of the race track resulted in conditions affecting the public health or morals to any material extent. A race track is not a public nuisance *per se* and the record in the present case does not establish that the track was operated in such a manner as to create a public nuisance. We conclude that plaintiffs have failed to establish their allegation of a public nuisance.

The remaining question is whether or not the operation of the race track with pari-mutuel betting, and the operation of the horse barns at the track, constituted a private nuisance entitling plaintiffs to injunctive relief. Plaintiffs established their residence on West State Fair avenue over 19 years ago, with knowledge that the State fair grounds were located directly across the street. It may reasonably be inferred that they knew the grounds would be used for State fair purposes and that they would probably be subject to some unpleasantness resulting from the operation of the annual fair and other use of the premises. They apparently made no complaint about the use of the grounds for State fair purposes. Furthermore, defendant racing association used a portion of these grounds for race-

track purposes for about 12 years before plaintiffs complained that this use constituted a public and private nuisance. Defendants argue that, as plaintiffs established their residence in close proximity to the State fair grounds and have acquiesced in the operation of the race track for many years without complaint, they are not now entitled to equitable relief. However, we cannot agree with this contention, as the record indicates that during the several years preceding the present suit plaintiffs were subjected to increasing annoyance, unpleasantness, and nuisance through the operation of the race track and barns and the conduct of persons employed about the track. The testimony is uncontradicted that plaintiffs were subjected to flies and insects attracted by the horse stables; that they were annoyed by the odor of manure permitted to accumulate near the horse barns; that they were subjected to loud noises and profane language; that the operation of the horse barns and the conduct of employees created a continuous fire hazard; and that patrons of the race track parked their automobiles so as to interfere with traffic in the street and to block plaintiffs' driveway. While a race track is not a nuisance *per se,* the record is convincing that the track and barns have been operated in such a manner as to subject plaintiffs to a common or private nuisance which should be abated. The rule applicable to the present situation was well stated in *Adams* v. *Kalamazoo Ice & Fuel Co.,* 245 Mich. 261, as follows:

"While the court of equity has power to abate nuisances in protection of property rights, and to conserve the enjoyment, health, comfort, and welfare of individuals, it moves with caution, deciding each case upon its particular facts, and accords protection against injury only in cases where an

action at law would afford no adequate redress. If a nuisance is private and arises out of a particular manner of operating a legitimate business, the court will do no more than point to the nuisance and decree adoption of methods calculated to eliminate the injurious features.''

In *Smith* v. *City of Ann Arbor,* 303 Mich. 476, 486, Mr. Justice BOYLES, writing for the court, said:

''If a nuisance is private and arises out of a particular manner of operating a legitimate business, we will do no more than point to the nuisance and decree the adoption of methods calculated to eliminate the injurious features. *MacKenzie* v. *Frank M. Pauli Co.,* 207 Mich. 456 (6 A. L. R. 1305). Where it is possible to eliminate the objectionable features which infringe upon the ordinary rights of others, equity may so decree instead of compelling an abatement of the entire business. *Waier* v. *Peerless Oil Co.,* 265 Mich. 398.''

See, also, *Northwest Home Owners Ass'n* v. *City of Detroit,* 298 Mich. 622; *Shimberg* v. *Risdon Creamery Co.,* 215 Mich. 94; *MacKenzie* v. *Frank M. Pauli Co.,* 207 Mich. 456 (6 A. L. R. 1305).

The trial court's decree, which permanently enjoined defendants from further operation of the race track, would destroy the business of defendant racing association, which business the legislature has seen fit to legitimatize by the adoption of Act No. 199. Our *de novo* review of the record convinces us that this decree did not equitably determine the rights of the parties. The common or private nuisance complained of by plaintiffs arose, at least in part, from the apparently rather negligent manner in which the racing association operated its track and horse barns. We believe that it could adopt methods which would largely eliminate the nuisance complained of. The department of

agriculture and the racing commissioner in effect
admit the existence of a private nuisance, and in
their brief they state: "The elements of nuisance
of which the plaintiffs complain should, we think,
be abated." On defendants' application we en-
tered an order staying the injunctive provision of
the decree pending appeal, on condition that they
comply with certain requirements intended to elim-
inate, or at least minimize, the nuisance and fire
hazard. We understand that compliance with this
order has, at least to some extent, minimized the
nuisance of which plaintiffs complained. Other
questions raised on this appeal do not require con-
sideration.

We conclude that the decree of the trial court
should be vacated and set aside and that a decree
should be entered in this court in accordance with
this opinion. The decree should, among other
things, determine (1) that the last sentence of Act
No. 199, § 9, Pub. Acts 1933, purporting to grant the
department of agriculture authority to lease State-
owned land under its control for the conduct of
horse racing, is unconstitutional; (2) that the re-
mainder of said Act No. 199 is constitutional and
a proper legislative exercise of the State's police
power; (3) that the lease from the department of
agriculture to defendant racing association is void;
(4) that the operation of the race track with pari-
mutuel betting does not constitute a public nui-
sance; and (5) that the method of operation of the
race track and the horse barns created a private
nuisance which, insofar as is reasonably possible,
should be abated. The decree should further pro-
vide that defendant racing association shall en-
close all manure receptacles; disinfect these recep-
tacles and remove all manure from the premises
every 24 hours; that it shall police and supervise

the race-track premises and horse barns so as to eliminate, insofar as possible, all fire hazards, obnoxious noises, disturbances, and improper conduct; and that it shall from time to time do such other acts and things as it can reasonably be required to do to abate the private nuisance complained of. The decree should further provide for remanding this case to the trial court for enforcement and for such further action as may from time to time be deemed necessary and advisable.

As this case involves questions of public importance, no costs are allowed.

CARR, SHARPE, and REID, JJ., concurred with STARR, J.

BUSHNELL, J. (concurring). I concur. However, I cannot approve the present method of conducting the pari-mutuel system.

BOYLES, J. (concurring). I concur in the opinion of Mr. Justice STARR, except as to what is said regarding the title of the act not being broad enough to allow the department of agriculture to enter into the lease. As stated in the opinion, plaintiffs do not, in their bill of complaint or amended bill, question the validity of the lease. This issue has no bearing on decision of plaintiffs' rights in this case and ought not to be adjudicated in the case. The statement that the lease is void because the department of agriculture did not have constitutional authority to lease the property, for the above reason is dictum. This in effect is indicated by Mr. Justice STARR in saying:

"Our holding that the lease is void does not entitle plaintiffs to the injunctive relief which they sought, nor does it have any bearing upon their

claim that the operation of the race track constituted a public or private nuisance."

I join in the opinion of Mr. Justice STARR, except as stated herein.

BUTZEL, C. J., and NORTH, J. concurred with BOYLES, J.